NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

GOLDEN STATE BOTTLING COMPA-
NY, Inc., d/b/a Pepsi-Cola Bottling Com-
pany of Sacramento, Respondent.

No. 19803.

United States Court of Appeals
Ninth Circuit.

Dec. 2, 1965.

Rehearing Denied Jan. 7, 1966.

Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Elliott Moore, Richard P. Lawlor, Attys., N.L.R.B., Washington, D. C., for petitioner.

Edwin H. Franzen, Morton B. Jackson, Hill, Farrer & Burrill, Los Angeles, Cal., for respondent.

Before CHAMBERS and KOELSCH, Circuit Judges, and THOMPSON, District Judge.

THOMPSON, District Judge:

Effective April 1, 1961, the union, P.C.B.C.E., Inc. and Respondent, Golden State Bottling Company, Inc., entered into a collective bargaining agreement covering all non-supervisory employees at the Sacramento, California plant of Golden State Bottling Company, Inc. Membership in the union was limited to employees of Golden State and it was independently operated and controlled. The agreement contained a provision for annual termination on notice.[1] It was renewed in writing on March 31, 1962 with a 12½ cents per hour increase in wages. In January, 1963, the union sent timely notice to Golden State demanding negotiations for a new contract.

Negotiations commenced early in March and bargaining continued to the end of the month. No agreement was reached and the negotiations were deadlocked. At the last union meeting, the employer's proposals were rejected by the union by a tie vote and the employees who rejected the contract signed cards to solicit the Teamsters Union as the bargaining agent. When the employees reported for work the morning of April 1, they were called together by Schilling, the General Manager of Golden State, and informed that they would not be permitted to work without a contract. He renewed his proposal, stating that it

was his best and final offer, and requested the employees to accept it.

At this point, the union members, disagreeing among themselves about what to do, split into two groups. The smaller group of ten, led by Wagner and by Baker, who was actively promoting the Teamsters Union, and including all the union's duly elected officers, left the plant and milled around outside the gate. The remaining fourteen employees were once again given the company's final offer, told that they could not work without a contract, and informed that they could not hold meetings on company property. It was also suggested that there would have to be officers to sign the contract. These employees adjourned to an adjacent alley and one of them conferred with the union attorney by telephone and received advice that they could hold a meeting and elect new officers. They agreed to accept the company offer and elected new officers who signed the contract for the union. The attorney's advice appears to have been in conflict with the union's Constitution and by-laws respecting notices of meetings, although Baker's group was informed of what was going on by members who went back and forth between the two groups.

Of the ten employees who left the plant, all but Baker and Wagner returned to work the same day. Wagner returned to work the next day, April 2, and Baker returned to work on April 3. Thus, all employees eventually accepted the contract terms.

On August 16, 1963, Baker was fired, purportedly for having been caught taking unauthorized time off to purchase football tickets. There had been intervening conversations between Schilling and Baker in which it was suggested that Baker find work elsewhere and Schilling had stated that the March and April incidents had not been forgotten.

[1] "This agreement shall be effective as of the 1st day of April, 1961, and shall continue in effect until the 31st day of March, 1962, and from year to year thereafter, unless terminated by either party giving written notice of termination to the other party not less than sixty days, nor more than 120 days, prior to the anniversary date of the contract."

As a result of the foregoing, unfair labor practice charges were filed against Respondent. After a hearing and a decision by the trial examiner, the Board made the following findings and conclusions:

"We find, as did the trial examiner, that the Respondent violated Section 8(a) (3) and (1) of the Act by denying employment to Wagner on April 1, 1963, and to Baker on April 1 and 2, 1963, because they declined to sign the Respondent's contract proposal as officers of the incumbent union, P.C.B.C.E., Inc., hereinafter referred to as Union. We further find that the Respondent violated those Sections of the Act by discharging Baker on August 16 because of his said activity in April and his attempt to interest the employees in joining the International Brotherhood of Teamsters.

"The Trial Examiner concluded that the Respondent, by its conduct on April 1 in conditioning continued employment of all its employees upon their acceptance of the Respondent's contract offer and forcing the employees to elect new officers to sign that contract, dominated the administration of the Union in violation of Section 8(a) (2) and (1) of the Act. We agree that the Respondent thereby interfered with the administration of the Union in violation of Section 8(a) (2) and (1) of the Act, but conclude that those acts did not constitute domination of that organization within the meaning of Section 8(a) (2)."

The Board, in addition to ordering Respondent to withdraw recognition from the union temporarily and to reinstate Baker with back pay, and to reimburse Wagner for loss of one day's wages, ordered Respondent to cease and desist from (a) interfering with the administration of the union or any other labor organization; (b) recognizing anyone but the duly elected union bargaining agent for the purpose of collective bargaining; (c) bargaining with the union until it has been certified as exclusive representative by the National Labor Relations Board; (d) giving effect to the April 1 contract; and (e) discharging, withholding or threatening to withhold employment from any employee for the purpose of compelling him or his bargaining agent to yield to Respondent's contract proposals. The Board then instituted this action by filing a petition for enforcement of its Order.

 We affirm the finding that Respondent violated Section 8(a) (3) and (1) of the Act by firing Baker on August 16, 1963. There is, in the record considered as a whole, substantial evidence to support the Board's finding that Baker's discharge was motivated by his past union activities on behalf of the Teamsters. National Labor Relations Board v. Sellers (9 CCA 1965), 346 F. 2d 625.

The remaining findings of unfair labor practices stem substantially from the April 1 lockout by Golden State. In American Ship Building Company v. National Labor Relations Board, 380 U.S. 300, 85 S.Ct. 955, 13 L.Ed.2d 855 (1965), decided after the Board's decision here, the Supreme Court held that a lockout by an employer used as a means of bringing pressure on his employees in support of his bargaining position does not violate Section 8(a) (3) and (1) unless there exists a supportable finding of unlawful intent on the part of the employer to injure a labor organization or to evade his duty to bargain collectively, or to discourage union membership.

 We do not think that the rationale of the American Ship Building case is inapplicable merely because of the charges here under Section 8(a) (2), proscribing employer domination and interference with union administration, which were not present in that case. True, the effect of this lockout was to disrupt the orderly internal functioning of the union, but this result of an otherwise lawful act cannot make that act an unfair labor practice. This was not a necessary consequence of the lockout and

the employer's refusal of work did not necessarily destroy the union's capacity for effective and responsible representation.

■ The Board's characterization of the events of April 1, 1963 as interference with the administration of the union is based on the fact that the union split into two factions and that one of these factions promptly backed away from the union's earlier position and decided to accept the company's proposal. This seems to us to be simply a possible result of a legal lockout. In the absence of evidence that the employer was wrongfully motivated in the exercise of his right to refuse work or that union disruption was a necessary consequence thereof, we cannot sustain the view that the lockout was an unfair labor practice.

■ The Board found violations of Section 8(a) (1) and (3) in the denial of work to Wagner and Baker on April 1 and 2 because they refused to sign the contract as officers of the union. There is no evidence to support this finding. Denial of work to Wagner and Baker was merely part of the general lockout and they were treated no differently than other employees.

■ The Board also found violations of Section 8(a) (1) and (2) in that the company conditioned continued employment on the employees' acceptance of the contract and "forced" them to elect new officers to sign the contract. To repeat, the conditioning of all work upon acceptance of the contract is the very essence of a lockout which, as a matter of law, cannot be an unfair labor practice without a finding of proscribed intent or necessary destruction of the union's capacity for responsible and effective representation. There is no such finding here, nor could one be made on this record. There was testimony, accepted by the Board, that Schilling told the union majority to hold an election of new officers so that there would be someone to sign the contract. This falls short of forcing an election since the men were out of the company plant on their own

before the election was held and sought and received the advice of their own attorney.

■■ It was, nevertheless, inappropriate in these circumstances for Schilling, with full knowledge of the union split, to tell one of the groups what to do, and to this extent, the record sustains the Board's finding that he interfered with the administration of the union. Schilling sought the bargaining benefits of a lockout but was unwilling to assume the burdens. His whole course of conduct on April 1 demonstrates an unwillingness for the plant to be shut down and an avid desire to do anything to keep it operating despite the proclaimed lockout. The legal course open to him was to hire temporary replacements for the locked out employees. Labor Board v. Brown, 1965, 380 U.S. 278, 85 S.Ct. 980, 13 L.Ed.2d 839. His duty was to leave the union alone to work out its own destiny. It was an unfair labor practice for him to bargain with the remaining employees, none of whom, by chance, was a member of the authorized bargaining committee for the union, and his suggestion that new officers be elected, while clearly an interference with the administration of the union under the circumstances of economic compulsion inherent in the lockout, serves also to aggravate the impropriety of his dealing at all with a splinter group.

■ One paragraph of the Board's Order which we will not enforce deserves special comment. Paragraph 1(d) enjoins the company from:

"Performing, enforcing, or giving effect to the contract with P.C.B. C.E., Inc., dated April 1, 1963, or any supplement or renewal thereof; *Provided, however,* that nothing herein shall be construed to require the Respondent to vary any substantive provision of such agreement, or to prejudice the assertion by the employees of any rights they have thereunder."

We fail to see how the company can cease and desist from performing or

enforcing the contract while at the same time allowing the assertion of employee rights thereunder. We refuse to direct such one-sided enforcement.

The Board's Order is enforced in conformity with this opinion.