**UNITED AUTOMOBILE, AEROSPACE AND AGRICULTURAL IMPLEMENT WORKERS OF AMERICA, UAW, Plaintiff-Appellee,**

v.

**NATIONAL LABOR RELATIONS BOARD, Defendant-Appellant.**

**No. 25706.**

United States Court of Appeals, Ninth Circuit.

May 19, 1971.

Rehearing Denied June 29, 1971.

George Arnold (argued), of Arnold, Smith & Schwartz, Los Angeles, Cal., for defendant-appellant.

Thomas Silfen (argued), Atty. for NLRB, Arnold Ordman, Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Washington, D. C., Ralph E. Kennedy, Director, NLRB, Munger, Tolles, Hills & Rickershauser, Los Angeles, Cal., for plaintiff-appellee.

Before CHAMBERS, TUTTLE* and ELY, Circuit Judges.

TUTTLE, Circuit Judge:

This Petition for Review filed by the union complains of the failure of the National Labor Relations Board to make

* Elbert Parr Tuttle, Senior Judge, United States Court of Appeals for the Fifth Circuit, sitting by designation.

a "successor" employer fully liable to respond to the relief ordered by the Board against the original employer, found to be in violation of Section 8(a) (1), (3) (4) of the National Labor Relations Act 29 U.S.C.A. § 151 et seq.

The case comes to us without any dispute as to the facts. The Board stated the basic facts as follows:

"The Trial Examiner found, and we agree, that Thomas, which operated an engine rebuilding plant in the City of Industry, California, until September 9, 1968, violated Section 8(a) (1), (3) and (4) of the Act by engaging in unlawful conduct, including discriminatory warning notices to two employees and the discriminatory discharge of employees Richard Dickey, James Wilkins, Arthur Pollack, and David Dick. The Trial Examiner also correctly found that Upshur, which took over Thomas' business with knowledge of the latter's unfair labor practices, and resumed operations of the plant on September 25, 1968, was the successor employer to Thomas."

The Board also adopted the following findings of fact by the Examiner:

"When Thomas closed on September 9, it had in its employ 120–130 production and maintenance employees and about 25 clerical employees. At the time Thomas' employees picked up their checks for work performed until September 9, they were given application forms for work with Upshur. Thomas' employees applied for work with Upshur. As of December 17, Upshur had approximately 97 production and maintenance employees of whom 90 were employed by Thomas on September 9. Also on December 17, Upshur had about 25 clerical employees, 15 of whom had been employed by Thomas on September 9. The production and maintenance employees of Upshur have the same working hours, same lunch periods and the same break periods as did the Thomas employees. Walker became the plant superintendent at Upshur and hired Thomas applicants for employment. Walker was hired by Upshur on September 15. On the entire record, I find according to the credible evidence, that the Upshur employees exercise substantially the same skills and perform the same jobs as they did for Thomas.

"While some of the top supervision of Thomas were not employed by Upshur, some of key supervision went over to Upshur. These included Walker, Zalinski, Hollenbeck, Peta, Wiggins, Byers and Stegmair. Fagardo and DeLeat, who had been at least leadmen at Thomas, went with Upshur. The record is silent as to how many other members of supervision went to Upshur from Thomas."

In addition, the trial examiner found:

"Upshur is in the same 'employing industry' as was Thomas. There has been a continuity of the original business. The same plant and substantially the same facilities have been used. *There has been substantially the same work force. The business is the same* (emphasis added)."

The Board did not expressly find to the contrary of the italicized fact finding, but neither did it approve or adopt the findings. The Board used its "boiler plate" language [1] which, unfortunately leaves it to us to make a detailed analysis of its decision to determine whether the critical finding emphasized above was approved by the Board.

In view of the fact that the Union places its case almost entirely on the Board's decision in Perma Vinyl Corp., 164 N.L.R.B. 968 (1967) and the order enforcing it at United States Pipe and Foundry Co. v. N. L. R. B., 398 F.2d 544 (1968), we conclude that, as to the principal issues before us—reinstatement and backpay obligations of the successor corporation—it is necessary to de-

1. "The Board * * * hereby adopts the findings, conclusions, and recommendations of the Trial Examiner only to the extent consistent herewith."

termine whether this finding of "substantially the same work force" made by the Trial Examiner became a finding by the Board.

In *Perma Vinyl, supra,* the successor employed "essentially the same personnel" as its predecessor. Under these circumstances the Board stated in *Perma Vinyl:*

"We are persuaded that one who acquires and operates a business of an Employer found guilty of unfair labor practices in basically unchanged form under circumstances which charge him with notice of unfair labor charges against his predecessor should be held responsible for remedying his predecessor's unlawful conduct."

The Union, in its reply brief, states flatly that the Trial Examiner's finding emphasized above—"There has been substantially the same work force * * *" "was adopted by the Board." This is an incorrect statement.

Although not expressly rejecting the finding, the board took pains to distinguish this case from *Perma Vinyl* in the following passage:

"As noted above, the Trial Examiner found that Thomas discriminatorily discharged Dickey, Pollock, Wilkins, and Dick, and he recommended that Upshur be ordered to offer them immediate reinstatement and jointly and severally with Thomas, to make them whole for loss of earnings suffered as a result of the discrimination. In making these findings, the Trial Examiner found Upshur has "substantially the same work force" as Thomas. In *Perma Vinyl,* on which the Trial Examiner relied, the successor employed "essentially the same personnel" as its predecessor. However, the record herein shows that when Thomas closed down on September 9, 1968, it had 120–130 production and maintenance employees and within a week after Upshur reopened the plant on September 25, 1968, the latter had taken on 97 production and maintenance employees, 90 of whom were employees of Thomas and 7 were outside employees.

"The justification for ordering immediate and unconditional reinstatement of the predecessor's dischargees in *Perma Vinyl* and related cases is that but for their unlawful discharge by the predecessor they would have been offered employment by the successor, as were all or essentially all of the other employees on the predecessor's payroll at the time of the changeover. However, *a like assumption cannot be made in this case because Upshur hired only 90 of Thomas' 120–130 production and maintenance employees. Accordingly, as there was considerably less than a total transfer of Thomas' labor force to Upshur and as it cannot. * * *"* (emphasis added) (footnotes omitted)

We would agree that there should be no distinction between a finding that "essentially the same personnel were hired by the successor" and a finding that "There has been substantially the same work force." However, the Board did not find there was substantially the same work force. It clearly rejected the finding in the analysis it made of the basic facts. Unfortunately, perhaps neither party undertook to establish the facts whether the particular job classifications held by the persons discriminatorily fired by the predecessor were among the few non-Thomas employees hired by Upshur.

The Court of Appeals strongly stressed the fact that jobs were open for the fired employees when it enforced the Board's order in *Perma Vinyl:*

"This contention (that the dischargees should be reinstated by the successor) rests on the fact that (the successor) continued to operate the plant in the same manner and with the same jobs. The order does not require that jobs be created. * * * We conclude that the Board had the power under § 10(c), based on the circumstances obtaining, to require (the

successor) to reinstate the employees involved. Only (the successor) can reinstate the employees; it took the plant with notice that the employees were claiming their jobs; the jobs still exist, the exigencies of the situation are such that the policy of protecting the employees can only be afforded by (the successor). 398 F.2d at 548."

We are forced to conclude that neither the Board's decision in *Perma Vinyl*, which it announced as "the principles by which we will be guided in future cases," nor the Court of Appeals opinion is in conflict with the action of the Board here in declining to enter a cease and desist order and in declining to order a reinstatement of the unlawfully fired employees [2] and in declining to enter a backpay order, except for such period as might exceed five days following any refusal by Upshur to comply with the limited rehiring order.

Petitioner complains of the refusal of the Board of its motion to reopen hearings, following the Board's decision which, it says, would have permitted the Union to prove that within a relatively short time after the reopening of the plant additional Thomas employees were hired—enough to make a complement of within 10–15 as many as before the shut down. We cannot find error in this refusal in light of stipulations twice made by the parties as to the figure of 90 Thomas employees out of a total of 97 as compared with a total Thomas employment of 120–130

at closing. As stated by the Board, these facts were within the knowledge of the Union long before the decision of the Board and within its discretion, the Board could determine the proposed data as not being newly discovered evidence under Board rules and regulations 102.-48(d) (1).

We think it not amiss to sound a caveat to what appears, although not expressly articulated in the opinion, to be a down grading of the importance of the *Perma Vinyl* rule, announced by the Board as "principles by which [it] will be guided in future cases."

The General Counsel states, in his brief: "In effect the Board [in this case] indicated that the backpay aspect of the *Perma Vinyl* remedy will be narrowly construed—presumably, restricted to aggravated situations in which unusual remedial action is appropriate."

We do not affirm the Board's action here on any basis other than the ground that it has not been shown that "substantially" or "essentially" the same work force manned the successor's plant. We consider the remedy of requiring the successor to "share a joint and several responsibility in the matter of back pay" and rehiring with the predecessor to be an appropriate remedy to "effectuate the policies of the act" in situations like that here before the court, but with the added circumstance that the company has maintained substantially the same workforce.[3]

The Order of the Board will be enforced.

2. "The Board ordered them hired if, and when vacancies occurred."

3. It is difficult to envision what is comprehended within the General Counsel's formulation of a rule that would make this remedy available only in "aggravated situations," short of a finding that the successor is itself actually guilty of the unfair labor practices, or a finding that the successor is not a bona fide successor as distinguished from an alter ego—a circumstance which has always required that it be treated as if it were the real wrongdoer. Regal Knitwear Co. v. N.L.R.B., 324 U.S. 9, 13–14, 65 S.Ct. 478, 89 L.Ed. 661; J. Howard Jenks d/b/a Glendora Plumbing, 172 NLRB No. 197 (1968) 71 LRRM 1055.