GOLDEN STATE BOTTLING CO., INC., FORMERLY
PEPSI-COLA BOTTLING CO. OF SACRA-
MENTO, ET AL. *v*. NATIONAL LABOR
RELATIONS BOARD

No. 72–702.  Argued October 11, 1973—
Decided December 5, 1973

B<small>RENNAN</small>, J., delivered the opinion for a unanimous Court.

*Morton B. Jackson* argued the cause for petitioners. With him on the briefs was *Gilford G. Rowland.*

*Norton J. Come* argued the cause for respondent. With him on the brief were *Solicitor General Bork, Allan A. Tuttle, Peter G. Nash, John S. Irving, Patrick Hardin,* and *William H. DuRoss III.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The principal question for decision in this case is whether the bona fide purchaser of a business, who acquires and continues the business with knowledge that his predecessor has committed an unfair labor practice in the discharge of an employee, may be ordered by the National Labor Relations Board to reinstate the employee with backpay.

Petitioners are Golden State Bottling Co., Inc. (Golden State), and All American Beverages, Inc. (All American). All American bought Golden State's soft drink bottling and distribution business after the National Labor Relations Board had ordered Golden State, "its officers, agents, successors, and assigns" to reinstate with back pay a driver-salesman, Kenneth L. Baker, whose discharge by Golden State was found by the Board to have been an unfair labor practice.[1] In a subsequent back-

---

[1] On June 10, 1964, the Board found that Golden State violated §§ 8 (a)(3) and (1) of the National Labor Relations Act, 49 Stat. 452, as amended, 29 U. S. C. §§ 158 (a)(3) and (1), by discharging Baker, on August 16, 1963, because of union activities, and ordered Baker's reinstatement with backpay. 147 N. L. R. B. 410. On December 2, 1965, the Court of Appeals for the Ninth Circuit enforced the Board's order with respect to Baker. 353 F. 2d 667. Due to a delay in the Court of Appeals' disposition of the Board's petition for rehearing on a portion of the court's decision unrelated to Baker, a final decree was not entered until November 27, 1968, see 401 F. 2d 454.

pay specification proceeding to which both Golden State and All American were parties, see 29 CFR §§ 102.52–102.59, the Board found that All American continued after the acquisition to carry on the business without interruption or substantial changes in method of operation, employee complement, or supervisory personnel. In that circumstance, although All American was a bona fide purchaser of the business, unconnected with Golden State, the Board found that All American, having acquired the business with knowledge of the outstanding Board order, was a "successor" for purposes of the National Labor Relations Act and liable for the reinstatement of Baker with backpay under the principles announced in *Perma Vinyl Corp.*, 164 N. L. R. B. 968 (1967), enforced *sub nom. United States Pipe & Foundry Co. v. NLRB*, 398 F. 2d 544 (CA5 1968).[2] The Board therefore ordered that

---

[2] *Perma Vinyl* states the principles and their rationale as follows: "To further the public interest involved in effectuating the policies of the Act and achieve the 'objectives of national labor policy, reflected in established principles of federal law,' we are persuaded that one who acquires and operates a business of an employer found guilty of unfair labor practices in basically unchanged form under circumstances which charge him with notice of unfair labor practice charges against his predecessor should be held responsible for remedying his predecessor's unlawful conduct.

"In imposing this responsibility upon a bona fide purchaser, we are not unmindful of the fact that he was not a party to the unfair labor practices and continues to operate the business without any connection with his predecessor. However, in balancing the equities involved there are other significant factors which must be taken into account. Thus, 'It is the employing industry that is sought to be regulated and brought within the corrective and remedial provisions of the Act in the interest of industrial peace.' When a new employer is substituted in the employing industry there has been no real change in the employing industry insofar as the victims of past unfair labor practices are concerned, or the need for remedying those unfair labor practices. Appropriate steps must still be taken if the effects of the unfair labor practices are to be erased and all

All American reinstate Baker and that Golden State and All American jointly or severally pay Baker a specified sum of net backpay. 187 N. L. R. B. 1017 (1971). The Court of Appeals for the Ninth Circuit, one judge dissenting, enforced the order, 467 F. 2d 164 (1972). We granted certiorari, 410 U. S. 953 (1973). We affirm.

## I

There is a threshold question of whether the Court of Appeals erred in determining that the evidence "offered substantial support for the Board's finding that All American purchased [the bottling business] with knowledge of the unfair labor practice litigation." 467 F. 2d, at 165. We address that question mindful of the congressionally imposed limitation on this Court's review of the Court of Appeals' determination:

> "Whether on the record as a whole there is substantial evidence to support agency findings is a question which Congress has placed in the keeping of the Courts of Appeals. This Court will intervene only in what ought to be the rare instance *when the standard appears to have been misapprehended or grossly misapplied. Universal Camera Corp.* v.

employees reassured of their statutory rights. And it is the successor who has taken over control of the business who is generally in the best position to remedy such unfair labor practices most effectively. The imposition of this responsibility upon even the bona fide purchaser does not work an unfair hardship upon him. When he substituted himself in place of the perpetrator of the unfair labor practices, he became the beneficiary of the unremedied unfair labor practices. Also, his potential liability for remedying the unfair labor practices is a matter which can be reflected in the price he pays for the business, or he may secure an indemnity clause in the sales contract which will indemnify him for liability arising from the seller's unfair labor practices." 164 N. L. R. B. 968, 969 (footnotes omitted).

*NLRB,* 340 U. S. 474, 491 (1951). (Emphasis added.)

Thus limited, we cannot find fault with the Court of Appeals' conclusion that, on the record as a whole, substantial evidence supported the Board's finding that All American purchased the business with knowledge of the unfair labor practice litigation. Eugene Schilling, Golden State's secretary and manager of the bottling business, who had discharged Baker and then closely followed the progress of the litigation, continued with the enterprise under All American's ownership with the title of general manager and "president." Indeed, All American's purchase of the business was conditioned on Schilling's staying on in a managerial capacity; the sales contract expressly stipulated that Schilling "shall have agreed to be employed by [All American] for a period of one year after the Closing Date as General Manager . . . ." Schilling participated on at least one occasion with Golden State's president, Edwin J. Crofoot, in the sale negotiations. Even if strict agency principles would not impute Schilling's knowledge to All American until Schilling actually entered its employ, see Restatement (Second) of Agency § 9 (3) (1958); *Thomas Engine Corp.,* 179 N. L. R. B. 1029, 1042 (1970), enforced *sub nom. UAW* v. *NLRB,* 442 F. 2d 1180 (CA9 1971), the Court of Appeals cannot be said to have "misapprehended or grossly misapplied" the governing standard in appraising this evidence as sufficiently substantial to support an inference that Schilling informed his prospective employer of the litigation before completion of the sale. It is true that both Schilling and Crofoot testified at the hearing in the specification proceeding that they had not informed All American of the litigation before the sale was completed. But the trial examiner refused to credit their testimony in light of documentary evidence from which he inferred that the Golden State officials had

attempted to conceal the sale from the Board, 187 N. L. R. B., at 1021. The examiner also refused to credit Crofoot's testimony that, while All American expressly asked him whether any litigation was pending, he did not mention the unfair labor practice case because he had forgotten it, although admitting that he had authorized payment of substantial fees in connection with it. *Ibid.* Finally, the examiner inferred from the unexplained failure of All American to produce its negotiators as witnesses that their testimony would not have supported All American's disclaimer of knowledge.[3]

On this state of the record, there is no justification for this Court's intervention, since *Universal Camera* precludes us from substituting our judgment for that of the Court of Appeals. "This is not the place . . . to reverse a Court of Appeals because were we in its place we would find the record tilting one way rather than the other . . . ." *NLRB* v. *Pittsburgh S. S. Co.,* 340 U. S. 498, 503 (1951); see *Central Hardware Co.* v. *NLRB,* 407 U. S. 539, 548 (1972).

## II

The Board has pursued an uneven course in its treatment of a bona fide successor's liability to remedy the unfair labor practices of its predecessor. In 1944 the Board determined that liability would not be imposed on a bona fide successor, *South Carolina Granite Co.,* 58 N. L. R. B. 1448, enforced *sub nom. NLRB* v. *Blair Quarries,Inc.,*152 F. 2d 25 (CA4 1945). In 1947 the Board abandoned that view and determined that joint and several remedial responsibility would be imposed upon a bona fide successor who had knowledge of the seller's unfair labor practice at the time of the purchase, *Alex-*

---

[3] See, *e. g., Interstate Circuit, Inc.* v. *United States,* 306 U. S. 208, 226 (1939); *NLRB* v. *Dorn's Transp. Co., Inc.,* 405 F. 2d 706, 713 (CA2 1969).

*ander Milburn Co.,* 78 N. L. R. B. 747. When, however, two Courts of Appeals refused to enforce remedial orders against bona fide successors, *NLRB* v. *Birdsall-Stockdale Motor Co.,* 208 F. 2d 234 (CA10 1953), and *NLRB* v. *Lunder Shoe Corp.,* 211 F. 2d 284 (CA1 1954), the Board, in 1954, re-examined and overruled *Alexander Milburn Co.,* declaring, in *Symns Grocer Co.,* 109 N. L. R. B. 346, that "[n]o provision of the [National Labor Relations] Act authorizes the Board to impose the responsibility for remedying unfair labor practices on persons who did not engage therein." *Id.,* at 348. Finally, in 1967, in yet another turnabout, the Board overruled *Symns Grocer Co.* in *Perma Vinyl, supra,* and announced that, in circumstances there defined, see n. 2, *supra,* remedial orders would be imposed upon bona fide successors for the unfair labor practices of their predecessors.

We must consider at the outset whether the issuance of a reinstatement and backpay order against a bona fide successor exceeds the Board's remedial powers under § 10 (c) of the Act, 29 U. S. C. § 160 (c). Section 10 (c), in pertinent part, provides:

> "If upon the preponderance of the testimony taken the Board shall be of the opinion that *any person named in the complaint has engaged in . . . any such unfair labor practice,* then the Board . . . shall issue and cause to be served on such person an order requiring *such person* to cease and desist from such unfair labor practice, and to take such affirmative action including reinstatement of employees with or without back pay, *as will effectuate the policies of this Act . . . ."* (Emphasis added.)

The Board's restrictive view in *Symns Grocer Co.* of its remedial powers derived from a limitation perceived to inhere in the words "any *person* named in the complaint has engaged in . . . any such unfair labor practice"

(emphasis added). These words were regarded as precluding authority to issue remedial orders against persons, like bona fide successors, who had not perpetrated the unfair labor practice. In *Perma Vinyl,* however, the Board found a broader authority in the words of the section authorizing the Board "to take such affirmative action . . . as will effectuate the policies of this Act." These words were construed as granting "broad administrative power . . . to frame such remedial orders . . . not, of course, restricted to requiring remedial action by the offending employer alone," 164 N. L. R. B., at 969, as were necessary to further the public interest subserved by the Act. See *NLRB* v. *Colten,* 105 F. 2d 179 (CA6 1939).

We agree that the Board's remedial powers under § 10 (c) include broad discretion to fashion and issue the order before us as relief adequate to achieve the ends, and effectuate the policies, of the Act. Early on, this Court recognized that § 10 (c) does not limit the Board's remedial powers to the actual perpetrator of an unfair labor practice and thereby prevent the Board from issuing orders binding a successor who did not himself commit the unlawful act. We have said that a Board order that, as in this case, runs to the "officers, agents, successors, and assigns" of an offending employer, may be applied, not only to a new employer who is "merely a disguised continuance of the old employer," *Southport Petroleum Co.* v. *NLRB,* 315 U. S. 100, 106 (1942), but also " 'in appropriate circumstances . . . [to] those to whom the business may have been transferred, whether as a means of evading the judgment *or for other reasons.' " Regal Knitwear Co.* v. *NLRB,* 324 U. S. 9, 14 (1945) (emphasis added); see also *NLRB* v. *Ozark Hardwood Co.,* 282 F. 2d 1, 5 (CA8 1960). If the words "person named in the complaint has engaged in . . . any . . . unfair labor practice" in § 10 (c) do not restrict Board authority to prevent

orders running to the offending employer's successors and assigns who have acquired the business as a means of evading the Board order, we do not see how those words may be read to bar the Board from issuing reinstatement and backpay orders against bona fide successors when the Board has properly found such orders to be necessary to protect the public interest in effectuating the policies of the Act. The Board's orders run to the evader and the bona fide purchaser, not because the act of evasion or the bona fide purchase is an unfair labor practice, but because the Board is obligated to effectuate the policies of the Act. Construing § 10 (c) thus to grant the Board remedial power to issue such orders results in a reading of the section, as it should be read, in the light of " 'the provisions of the whole law, and . . . its object and policy.' " *Mastro Plastics Corp.* v. *NLRB,* 350 U. S. 270, 285 (1956); see *NLRB* v. *Lion Oil Co.,* 352 U. S. 282, 288 (1957).

It is also argued, however, that Fed. Rule Civ. Proc. 65 (d), in any event, is a bar to judicial enforcement of a Board order requiring that a bona fide successor reinstate with backpay an employee illegally discharged by its predecessor. We disagree.[4] Rule 65 (d) provides that

---

[4] A short answer to petitioners' argument might appear to be that, because the Board's supplemental order to All American required only reinstatement and backpay, and not that All American cease and desist from future unlawful activity, no injunctive relief was ordered, and therefore Rule 65 (d) need not be considered. But we have previously found Rule 65 (d) applicable to mandatory injunctions and have noted that the courts of appeals have applied it "not only to prohibitory injunctions but to enforcement orders and affirmative decrees as well." *International Longshoremen's Assn.* v. *Philadelphia Marine Trade Assn.,* 389 U. S. 64, 75 and n. 14 (1967); see generally Developments in the Law—Injunctions, 78 Harv. L. Rev. 994, 1061–1063 (1965).

In not requiring the bona fide purchaser to cease and desist, the Board followed prior practice. See *Thomas Engine Corp.,* 179

178

injunctions and restraining orders shall be "binding only upon the parties to the action, their officers, agents, servants, employees, and attorneys, and upon those persons in active concert or participation with them who receive actual notice of the order by personal service or otherwise." See generally O. Fiss, Injunctions 691–700 (1972). We reject petitioners' contention that *Regal Knitwear Co.* v. *NLRB, supra,* at 14, supports the argument that this Rule is a bar to judicial authority to enforce Board orders against bona fide successors. In *Regal Knitwear,* the Court refused the offending employer's application to strike the phrase "successors and assigns" from the Board's order, citing *Walling* v. *James V. Reuter, Inc.,* 321 U. S. 671 (1944), which involved an injunction against violation of the Fair Labor Standards Act. *Regal Knitwear* treated a Board cease-and-desist order as "somewhat analogous" to such an injunction, and stated:

> " 'Not only is such an injunction enforcible by contempt proceedings against the corporation, its agents and officers and those individuals associated with it in the conduct of its business, but it may also, in appropriate circumstances, be enforced against those to whom the business may have been

N. L. R. B. 1029 and n. 4 (1970), enforced *sub nom. UAW* v. *NLRB,* 442 F. 2d 1180 (CA9 1971). This approach seems consistent with the fact that the successor's obligations do not arise out of its own unfair labor practices. The Board's practice after its earlier decision in *Alexander Milburn Co.,* 78 N. L. R. B. 747 (1947), had been to order the bona fide purchaser to cease and desist. This may account for decisions of the courts of appeals, *e. g., NLRB* v. *Birdsall-Stockdale Motor Co.,* 208 F. 2d 234, 236 (CA10 1953), opposing the Board's position in *Alexander Milburn,* which eventually led to the Board's overruling of that decision in *Symns Grocer Co.,* 109 N. L. R. B. 346 (1954). See DuRoss, Protecting Employee Remedial Rights Under the Perma Vinyl Doctrine, 39 Geo. Wash. L. Rev. 1063, 1089 (1971).

transferred, whether as a means of evading the judgment or for other reasons.' . . .

"We do not undertake to decide whether or under what circumstances any kind of successor or assign will be liable for violation of a Labor Board order. . . . [W]hether one brings himself in contempt as a 'successor or assign' depends on an appraisal of his relations and behavior and not upon mere construction of terms of the order." 324 U. S., at 14–15.

Plainly then, *Regal Knitwear* recognizes that Rule 65 (d) is not a bar to enforcement of all Board orders running to successors or assigns not themselves offending employers. The Court simply left open the question of whether the Rule precludes the enforcement of remedial orders running to a successor who is a bona fide purchaser. We answer that question today by holding that the Rule is not a bar to judicial enforcement of the Board order entered against the bona fide successor in this case.

Rule 65 (d) "is derived from the common-law doctrine that a decree of injunction not only binds the parties defendant but also those identified with them in interest, in 'privity' with them, represented by them or subject to their control." *Regal Knitwear,* 324 U. S., at 14. Persons acquiring an interest in property that is a subject of litigation are bound by, or entitled to the benefit of, a subsequent judgment, despite a lack of knowledge. Restatement of Judgments § 89, and comment *c* (1942); see 1 J. Story, Equity Jurisprudence § 536 (14th ed. 1918). This principle has not been limited to *in rem* or *quasi in rem* proceedings. Restatement of Judgments, *supra,* § 89, comment *d;* see *ICC* v. *Western N. Y. & P. R. Co.,* 82 F. 192, 194 (WD Pa. 1897). We apply that principle here in order to effectuate the public policies of the Act. "Courts of equity may, and fre-

quently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved." *Virginian R. Co.* v. *System Federation,* 300 U. S. 515, 552 (1937); see *Walling* v. *James V. Reuter, Inc.,* 321 U. S., at 674–675. We hold that a bona fide purchaser, acquiring, with knowledge that the wrong remains unremedied, the employing enterprise which was the locus of the unfair labor practice, may be considered in privity with its predecessor for purposes of Rule 65 (d). Cf. *United States* v. *Hall,* 472 F. 2d 261, 266–267 (CA5 1972); *Rivera* v. *Lawton,* 35 F. 2d 823 (CA1 1929); *United States* v. *Dean Rubber Mfg. Co.,* 71 F. Supp. 96 (WD Mo. 1946); *United Gilpin Corp.* v. *Wilmore,* 100 Colo. 453, 68 P. 2d 34 (1937); 7 J. Moore, Federal Practice ¶ 65.13, p. 109 and n. 1 (2d ed. 1973).

Our holding in no way contravenes the policy underlying Rule 65 (d), of not having "order[s] or injunction[s] so broad as to make punishable the conduct of persons who act independently and whose rights have not been adjudged according to law." *Regal Knitwear,* 324 U. S., at 13; see *Alemite Mfg. Corp.* v. *Staff,* 42 F. 2d 832 (CA2 1930). The tie between the offending employer and the bona fide purchaser of the business, supplied by a Board finding of a continuing business enterprise, establishes the requisite relationship of dependence. Moreover, procedures were announced in *Perma Vinyl* which provide the necessary procedural safeguards. There will be no adjudication of liability against a bona fide successor "without affording [it] a full opportunity at a hearing, after adequate notice, to present evidence on the question of whether it is a successor which is responsible for remedying a predecessor's unfair labor practices. The successor [will] also be entitled, of course, to be heard against the enforcement of any order issued against it." 164 N. L. R. B., at 969.

In this case, All American has no complaint that it was denied due notice and a fair hearing. It was made a party to the supplemental backpay specification proceeding, given notice of the hearing, and afforded full opportunity, with the assistance of counsel, to contest the question of its successorship for purposes of the Act and its knowledge of the pendency of the unfair labor practice litigation at the time of purchase.

We now turn to the question whether the Board properly exercised its discretion in issuing the order against All American. The Board's decisional process in the *Perma Vinyl* line of cases has involved striking a balance between the conflicting legitimate interests of the bona fide successor, the public, and the affected employee. What we said of the Board's decisional process in another context is pertinent here:

> "The ultimate problem is the balancing of the conflicting legitimate interests. The function of striking that balance to effectuate national labor policy is often a difficult and delicate responsibility, which the Congress committed primarily to the National Labor Relations Board, subject to limited judicial review." *NLRB* v. *Teamsters Local 449*, 353 U. S. 87, 96 (1957).

The Board's *Perma Vinyl* principles introduced into the balancing process an emphasis upon protection for the victimized employee:

> "Especially in need of help, it seems to us, are the employee victims of unfair labor practices who, because of their unlawful discharge, are now without meaningful remedy when title to the employing business operation changes hands." 164 N. L. R. B., at 969.

The Board found support for this policy, and we think

properly, in the Court's observation in *John Wiley & Sons, Inc.* v. *Livingston,* 376 U. S. 543, 549 (1964):

"Employees . . . ordinarily do not take part in negotiations leading to a change in corporate ownership. The negotiations will ordinarily not concern the well-being of the employees, whose advantage or disadvantage, potentially great, will inevitably be incidental to the main considerations. The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship."

In *Wiley* a labor union sued under § 301 of the Labor Management Relations Act, 1947, 61 Stat. 156, 29 U. S. C. § 185, to compel a corporate employer to arbitrate under a collective-bargaining agreement. The agreement originally had been entered into with another corporation which had subsequently merged with Wiley for genuine business reasons. We held that the disappearance of the contracting corporation by merger did not necessarily terminate the rights of employees guaranteed by the agreement and that the successor employer could be compelled to arbitrate, so long as there was a "substantial continuity of identity in the business enterprise," evidenced there by the wholesale transfer of the predecessor's employees to the successor. 376 U. S., at 551.[5]

---

[5] We recognize that, unlike the situation in *Wiley* where state law provided some support for holding the successor by consolidation liable, see 376 U. S., at 547–548, the general rule of corporate liability is that, when a corporation sells all of its assets to another, the latter is not responsible for the seller's debts or liabilities, except where (1) the purchaser expressly or impliedly agrees to assume the

Later, in *NLRB* v. *Burns International Security Services, Inc.*, 406 U. S. 272 (1972), the Court extended the *Wiley* principle to a case where the original employer, a plant protection company, was displaced by a different company. The new company hired a majority of the employees of the old company. The Court held that the new company had been properly ordered to bargain with the bargaining representative which had been certified to the old company, since the bargaining unit remained essentially unchanged. It was also held, however, that the new employer was not bound by the collective-bargaining agreement agreed to by the union and the predecessor employer, inasmuch as § 8 (d) of the Act, as well as the legislative history of the labor laws, reflected a policy against compelling a party to agree to substantive contractual obligations. 406 U. S., at 281–

obligations; (2) the purchaser is merely a continuation of the selling corporation; or (3) the transaction is entered into to escape liability. See 15 W. Fletcher, Cyclopedia Corporations §§ 7122–7123 (1961 rev. ed.); *Kloberdanz* v. *Joy Mfg. Co.*, 288 F. Supp. 817 (Colo. 1968). The perimeters of the labor-law doctrine of successorship, however, have not been so narrowly confined. See 15 W. Fletcher, *supra*, § 7122, p. 196 (Supp. 1972); Slicker, A Reconsideration of the Doctrine of Employer Successorship—A Step Toward a Rational Approach, 57 Minn. L. Rev. 1051, 1062–1063 (1973). Successorship has been found "where the new employer purchases a part or all of the assets of the predecessor employer, *NLRB* v. *Interstate 65 Corp.*, 453 F. 2d 269 (CA6 1971); [and] where the entire business is purchased by the new employer, *NLRB* v. *McFarland*, 306 F. 2d 219 (CA10 1962) . . . ." *NLRB* v. *Burns International Security Services, Inc.*, 406 U. S. 272, 306 (1972) (opinion of REHNQUIST, J.); see *id.*, at 291 (opinion of the Court). The refusal to adopt a mode of analysis requiring the Board to distinguish among mergers, consolidations, and purchases of assets is attributable to the fact that, so long as there is a continuity in the "employing industry," the public policies underlying the doctrine will be served by its broad application. Cf. *NLRB* v. *Colten*, 105 F. 2d 179, 183 (CA6 1939).

284, 291. Similarly, the Court refused to bind the union, since it might have made bargaining concessions with the previous employer which it would not necessarily agree to in negotiations with the successor. *Id.*, at 288.

We in no way qualify the *Burns* holdings in concluding that the Board's order against All American strikes an equitable balance.[6] When a new employer, such as All American, has acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations, those employees who have been retained will understandably view their job situations as essentially unaltered. Under these circumstances, the employees may well perceive the successor's failure to remedy the predecessor employer's unfair labor practices arising out of an unlawful discharge as a continuation of the predecessor's labor policies. To the extent that the employees' legitimate expectation is that the unfair labor practices will be remedied, a successor's failure to do so may result in labor unrest as the employees engage in collective activity to force remedial action. Similarly, if the employees identify the new employer's labor policies with those of the predecessor but do not take collective action, the successor may benefit from the unfair labor practices due to a continuing deterrent effect on union activities. Moreover, the Board's experience may reasonably lead it to believe that em-

---

[6] A purchasing company cannot be obligated to carry out under § 10 (c) every outstanding and unsatisfied order of the Board. For example, because the purchaser is not obligated by the Act to hire any of the predecessor's employees, see *NLRB* v. *Burns International Security Services, Inc., supra*, at 280 n. 5, the purchaser, if it does not hire any or a majority of those employees, will not be bound by an outstanding order to bargain issued by the Board against the predecessor or by any order tied to the continuance of the bargaining agent in the unit involved. *Id.*, at 280–281.

ployers intent on suppressing union activity may select for discharge those employees most actively engaged in union affairs, so that a failure to reinstate may result in a leadership vacuum in the bargaining unit. Cf. *Phelps Dodge Corp.* v. *NLRB,* 313 U. S. 177, 193 (1941). Further, unlike *Burns,* where an important labor policy opposed saddling the successor employer with the obligations of the collective-bargaining agreement, there is no underlying congressional policy here militating against the imposition of liability.

Avoidance of labor strife, prevention of a deterrent effect on the exercise of rights guaranteed employees by § 7 of the Act, 29 U. S. C. § 157, and protection for the victimized employee—all important policies subserved by the National Labor Relations Act, see 29 U. S. C. § 141—are achieved at a relatively minimal cost to the bona fide successor. Since the successor must have notice before liability can be imposed, "his potential liability for remedying the unfair labor practices is a matter which can be reflected in the price he pays for the business, or he may secure an indemnity clause in the sales contract which will indemnify him for liability arising from the seller's unfair labor practices." *Perma Vinyl Corp.,* 164 N. L. R. B., at 969. If the reinstated employee does not effectively perform, he may, of course, be discharged for cause. See 29 U. S. C. § 160 (c).[7]

---

[7] The only court of appeals panel which has considered the *Perma Vinyl* decision, other than the Fifth Circuit in enforcing the Board's order in that case, *United States Pipe & Foundry Co.* v. *NLRB,* 398 F. 2d 544, and the Ninth Circuit in the decision under review, 467 F. 2d 164, has expressed its approval. *UAW* v. *NLRB,* 442 F. 2d, at 1183 (Tuttle, J.). Commentators have generally concurred. See DuRoss, *supra,* n. 4; Goldberg, The Labor Law Obligations of a Successor Employer, 63 Nw. U. L. Rev. 735 (1969); Comment, Successor Employer's Obligation to Remedy Unfair Labor Practices, 68

## III

Golden State attacked in the Court of Appeals the provision of the Board's order directing that it and All American jointly or severally pay Baker a specified sum of net backpay. Golden State contends that, at most, it "should be ordered to pay to Baker back pay he would have earned as a driver-salesman in Golden State's employ from the date of this wrongful termination until the date of sale of the bottling company by Golden State, January 31, 1968." Brief for Petitioners 60.[8] The Court of Appeals declined to consider this argument because Golden State had agreed orally and in the contract of sale to indemnify All American for any backpay paid Baker by All American and therefore was "liable for such wages by virtue of its agreement, whether or not it would also be liable absent that agreement." 467 F. 2d, at 166. But Golden State's contractual obligation may be subject to contractual defenses and for that reason may not in fact be the equivalent of the liability imposed upon Golden State by the order. We shall therefore decide Golden State's challenge to the validity of the imposition of joint and several liability upon Golden State. We find no merit in the challenge.

The Board justified such provisions in *Perma Vinyl* in these words: "With respect to the offending employer himself, it must be obvious that it cannot be in the public interest to permit the violator of the Act to shed all

---

Col. L. Rev. 1602 (1968); Comment, 42 N. Y. U. L. Rev. 1202 (1967); Comment, 47 N. C. L. Rev. 459 (1969); Comment, 41 Temp. L. Q. 156 (1967); Comment, 13 Vill. L. Rev. 232 (1967).

[8] Although the original order of the Board required Golden State to reinstate Baker, 147 N. L. R. B., at 412, the Board concedes that the sale to All American terminated Golden State's reinstatement obligation. See *NLRB* v. *New Madrid Mfg. Co.*, 215 F. 2d 908 (CA8 1954).

responsibility for remedying his own unfair labor practices by simply disposing of the business. If he has unlawfully discharged employees before transferring ownership to another, he should at least be required to make whole the dischargees for any loss of pay suffered by reason of the discharges until such time as they secure substantially equivalent employment with another employer." 164 N. L. R. B., at 970. In addition, joint and several liability will more fully insure that the employee is fully recompensed by protecting him, *e. g.,* against the insolvency of the successor. The possibility that the successor will unjustifiably delay reinstatement to the predecessor's prejudice can be met by a protective provision in the contract of sale. We cannot say that the Board has erred in thus "striking [the] balance to effectuate national labor policy . . . ." *NLRB* v. *Teamsters Local 449,* 353 U. S., at 96.[9]

## IV

When Baker was discharged on August 16, 1963, he was Golden State's leading driver-salesman. On October 1, 1964, Golden State began converting its top driver-salesmen to distributors, or independent contractors, who realized net profits, after the deduction of their operating expenses, from the purchase of products from Golden State and the resale to customers. The Board found that Baker would have become a distributor on October 1, 1964, but for his discharge on August 16, 1963. The Board therefore computed Baker's gross backpay

[9] Golden State's reliance on *Textile Workers* v. *Darlington Mfg. Co.,* 380 U. S. 263 (1965), is misplaced. In *Darlington,* it was held that an employer's liquidation of its entire business, even if motivated by antiunion animus, would not be an unfair labor practice. *Id.,* at 273–274. But Golden State committed an unfair labor practice over four years prior to the sale of the bottling business to All American, and in that circumstance, the sale could not terminate its continuing liability for backpay.

subsequent to October 1, 1964, on the basis of what he would have earned as a distributor after that date.

Petitioners argue that the change on October 1, 1964, from driver-salesman to distributor ended their liability to Baker on that date because distributors are "independent contractors" excluded from coverage of the Act by 29 U. S. C. § 152 (3). The Court of Appeals rejected that contention, stating:

> "However, it is undisputed that when Baker was discriminatorily discharged he was an ordinary employee. The Act's remedies are not thwarted by the fact that an employee who is within the Act's protections when the discrimination occurs would have been promoted or transferred to a position not covered by the Act if he had not been discriminated against. NLRB v. Bell Aircraft Corp., 206 F. 2d 235, 236–237 (2d Cir. 1953)." 467 F. 2d, at 166.

We agree with the Court of Appeals and add only the observation that its conclusion is buttressed by the consideration that an order requiring reinstatement and backpay is aimed at "restoring the economic status quo that would have obtained but for the company's wrongful refusal to reinstate . . . ." *NLRB* v. *J. H. Rutter-Rex Mfg. Co., Inc.,* 396 U. S. 258, 263 (1969).[10] The Board treats net profits of the employee who goes into business on his own as interim earnings for the purpose of computing net backpay. *Mastro Plastics Corp.,* 136 N. L. R. B. 1342, 1350 (1962), enforced in part, *NLRB* v. *Mastro Plastics Corp.,* 354 F. 2d 170 (CA2 1965). In the effort to restore the economic status quo that would have

---

[10] It is apparent that had Golden State already reinstated Baker with backpay before the sale of its business, and thereby fully complied with the Board's order, All American would have had no more obligation to employ him in the continuing business than it had to employ any of Golden State's other employees. See n. 6, *supra.*

obtained but for Baker's wrongful discharge, it was also proper to compute what he would have earned after October 1, 1964, on the basis of his net profits as a distributor. Cf. *NLRB* v. *Rice Lake Creamery Co.,* 124 U. S. App. D. C. 355, 358, 365 F. 2d 888, 891 (1966); *NLRB* v. *Mooney Aircraft, Inc.,* 375 F. 2d 402 (CA5 1967).

*Affirmed.*