Wood, Chief Judge.
Walter "Wally" Gianino owned and operated a plastering company in St. Louis, Missouri, for over thirty years. That business-Gianino Plastering-abruptly closed in 2012. Around the same time, Wally's son, Curt Gianino, who had worked at Gianino Plastering for over a decade, founded his own company, CWG Plastering, LLC. CWG took on at least some of Gianino Plastering's customers, hired its *901 employees, and without missing a beat completed jobs that Gianino Plastering had begun. What might be a story of a son following in his father's footsteps is complicated by an inconvenient fact: Curt went into business on the same day that a $196,940.73 judgment was entered against his father's company.
That judgment arose out of Gianino Plastering's 2009 collective bargaining agreement with the Operative Plasterers and Cement Masons International Association Local 3 ("the Union"). The agreement obligated the company to make regular contributions to the Indiana State Council of Plasterers and Cement Masons Health and Welfare and Pension Funds ("the Funds"). Gianino Plastering soon fell short of meeting that obligation, prompting the Funds to sue in the Southern District of Indiana in 2011 to recover the delinquent payments. After a bench trial, the district court entered judgment against Gianino Plastering and in favor of the Funds. But the Funds were blocked from collecting on their judgment because Gianino Plastering filed for bankruptcy.
The Funds now have sued CWG, asserting that CWG is Gianino Plastering's successor and alter ego and thus liable for both the judgment and for other ongoing violations of the collective bargaining agreement. After discovery, the parties filed cross-motions for summary judgment. The district court ruled that the Funds had not produced enough evidence to proceed to trial. Our de novo review of the record convinces us to the contrary: the Funds proffered considerable evidence that a trier of fact could use to support its case against CWG, and so we reverse and remand.
I
The Funds rely on two legal theories to impose liability on CWG for Gianino Plastering's debts and continuing obligations. First, they contend that CWG is a successor to Gianino Plastering, making it liable for Gianino Plastering's failure to pay into the Funds. See, e.g. , Teed v. Thomas & Betts Power Sols., L.L.C. , 711 F.3d 763, 764 (7th Cir. 2013). Second, they argue that CWG must continue to abide by Gianino Plastering's collective bargaining obligations as an alter ego of the defunct company. See, e.g. , Int'l Union of Operating Eng'rs, Local 150, AFL-CIO v. Centor Contractors, Inc. , 831 F.2d 1309, 1312-13 (7th Cir. 1987).
Because CWG's liability arises under the Employee Retirement Income Security Act (ERISA), 29 U.S.C. §§ 1132, 1145, and the National Labor Relations Act (NLRA), 29 U.S.C. § 185(a), everyone assumed in the district court that federal law governs both claims. (On appeal, CWG cited a few cases that rested on state law, but it never actually argued that state law applies.) At oral argument, CWG belatedly took the position that state law should apply. Choice of law is not a subject of jurisdictional status, and so a party can forfeit that issue by overlooking it. McCoy v. Iberdrola Renewables, Inc. , 760 F.3d 674, 684 (7th Cir. 2014). That is what CWG did here: it failed to challenge the governing law either in its briefs before this court or in its summary judgment materials in the district court. We thus consider the subject forfeited, see Puffer v. Allstate Ins. Co. , 675 F.3d 709, 718 (7th Cir. 2012).
A
Even with the forfeiture, the question remains whether we should, on our own initiative, reject the use of federal law in favor of one or more state laws. We see no reason to do so here. If the choice of federal law appeared to be flatly inconsistent with the Supreme Court's decisions, we would have a different problem. But it is not. To the contrary, the NLRA and *902 ERISA are both statutes in which the Supreme Court has often opted for a federal standard, in light of the broad preemptive force of both ERISA and section 301 of the Labor Management Relations Act. See Smith v. Evening News Ass'n , 371 U.S. 195, 200, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962) ; Pilot Life Ins. Co. v. Dedeaux , 481 U.S. 41, 55-56, 107 S.Ct. 1549, 95 L.Ed.2d 39 (1987).
For example, the Supreme Court announced a federal standard for successor liability in a number of cases beginning with John Wiley & Sons, Inc. v. Livingston , 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), where it addressed the question whether a corporate successor had a duty to arbitrate under the labor laws. Id. at 548-49, 84 S.Ct. 909. There the Court found that federal law controlled and imposed a duty to arbitrate on the successor employer, even though only the predecessor had actually agreed to arbitrate. Id. at 550-51, 84 S.Ct. 909. Over the next decade, the Court periodically returned to successor liability under the NLRA and in each instance, it used a federal standard. See Golden State Bottling Co. v. NLRB , 414 U.S. 168, 174-85, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973) (finding that federal labor policy favored holding a successor liable for the unlawful discharge of an employee from its predecessor); NLRB v. Burns Int'l Sec. Servs., Inc. , 406 U.S. 272, 287-88, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972) (holding that a successor is not bound to substantive terms of previous collective bargaining agreement). See also Howard Johnson Co. v. Detroit Local Joint Exec. Bd., Hotel & Rest. Emps. & Bartenders Int'l Union, AFL-CIO , 417 U.S. 249, 264-65, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974) (no successor liability).
A federal standard for alter-ego liability also has deep roots in labor law. In Howard Johnson , the Supreme Court held, without even a nod to state law, that federal common law governed the question before it. It then went on to state that under federal law, an "alter ego" (unlike a successor corporation) "is in reality the same employer and is subject to all the legal and contractual obligations of the predecessor." 417 U.S. at 259 n.5, 94 S.Ct. 2236.
On the other side of the ledger we have the Supreme Court's decision in Peacock v. Thomas , 516 U.S. 349, 116 S.Ct. 862, 133 L.Ed.2d 817 (1996), which cautions federal courts not to jump to the assumption that federal common law applies. Peacock started out as an ERISA suit by a class against a company (Tru-Tech) and one of its shareholder-officers (Peacock). That suit resulted in a judgment against Tru-Tech, but not against Peacock. After the court of appeals affirmed the judgment, the named class representative, Thomas, sued Peacock to try to collect the judgment against Tru-Tech. The Supreme Court thus had to decide "whether federal courts possess ancillary jurisdiction over new actions in which a federal judgment creditor seeks to impose liability for a money judgment on a person not otherwise liable for the judgment," Id. at 351, 116 S.Ct. 862. On these facts, the Court found nothing in ERISA that would stretch federal standards that far. It emphasized that the complaint alleged no violation of ERISA or the Plan, and held that such allegations were essential for a veil-piercing action. Id. at 353-54, 116 S.Ct. 862. Without ancillary jurisdiction, the case did not belong in federal court.
Recognizing that this issue remains open, we nonetheless do not find in Peacock a clear signal undermining the Court's longstanding recognition that cases that do rest on ERISA or Plan language are both within the federal court's subject-matter jurisdiction and typically governed by federal law. In our case, the Funds *903 argue that CWG is engaged in an ongoing violation of the NLRA and ERISA by failing to comply with an extant collective bargaining agreement. To the extent that Peacock rested on a concern about the existence of a federal basis for the action, it does not appear to apply here. Particularly in light of CWG's failure to suggest that state law governs the alter-ego and successor liability questions, we see nothing inappropriate about applying federal law.
B
Both successor and alter-ego liability incorporate a scienter component coupled with an analysis of similarities between the old and new entities. Successor liability requires notice of the obligation by the new entity, while alter-ego liability requires more: a fraudulent intent to avoid collective bargaining obligations. Chi. Truck Drivers, Helpers & Warehouse Workers Union (Indep.) Pension Fund v. Tasemkin, Inc. , 59 F.3d 48, 49 (7th Cir. 1995) (successor liability); Cent. States, Se. & Sw. Areas Pension Fund v. Central Transport, Inc. , 85 F.3d 1282, 1287-88 (7th Cir. 1996) (alter-ego liability). Once scienter is established, successor liability is imposed if there is a "substantial continuity in the operation of the business before and after the sale." Tasemkin , 59 F.3d at 49 (quoting EEOC v. G-K-G, Inc. , 39 F.3d 740, 748 (7th Cir. 1994) ). For alter-ego liability, the Funds additionally must show "substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership." International Union of Operating Engineers, Local 150, AFL-CIO v. Rabine , 161 F.3d 427, 433 (7th Cir. 1998). The former holds the successor liable for violations of labor and employment law by the predecessor, while the latter holds the alter ego to the terms of the full collective bargaining agreement entered by the predecessor. See Howard Johnson , 417 U.S. at 259 n.5, 94 S.Ct. 2236. Both of these analyses are fact intensive, but they boil down to a simple question: despite two entities' legal separation, does the evidence suggest they are one and the same?
II
Here, the district court approached the issue by marching through a lengthy list of factors identified in several earlier decisions from this court, including Tasemkin, 59 F.3d 48, Sullivan v. Running Waters Irrigation, Inc. , 739 F.3d 354 (7th Cir. 2014), and Cent. States, Se. & Sw. Areas Pension Fund v. Sloan , 902 F.2d 593 (7th Cir. 1990). It found that "there are simply too many differences between the entities" for any reasonable factfinder to impose successor or alter-ego liability. In so finding, however, the court failed to credit the full range of evidence the Funds presented and it crossed the line between taking the evidence in the light most favorable to the nonmoving party, and weighing the evidence for itself.
Our own review of the evidence presented by the Funds for purposes of the summary judgment motion persuades us that there are striking continuities between Gianino Plastering's operations and the newly-formed CWG. As we noted at the outset, Wally was the sole owner of Gianino Plastering and shuttered the company in 2012; CWG opened within days of Gianino Plastering's closing and was solely owned by Curt. The companies' ownership, name, and address may have changed, but the transition of operations and employees from Gianino Plastering to CWG tells a different story.
The crucial period for analyzing the transition runs from July 27 to August 14. On July 27, the presiding magistrate judge recommended a $196,940.73 judgment against Gianino Plastering after an evidentiary hearing on damages. Wally undisputedly *904 told Curt about the ruling. Not quite three weeks later, on August 14, the district court adopted the magistrate judge's recommendation and entered judgment in that amount against Gianino Plastering. On the same day, Curt registered CWG Plastering as a Missouri LLC.
Meanwhile, Gianino Plastering was at work as a plastering subcontractor on a residential job called the LJPP project. Sometime in late July, Wally and Curt visited the LJPP general contractor and informed him that Gianino Plastering was shutting down but that CWG would honor Gianino Plastering's bid and complete the work. Documents as late as July 30 still listed Gianino Plastering as the plastering subcontractor, yet CWG later accepted a $28,800 payment for work completed through July 31. The subcontract was transferred to CWG on August 17, only three days after its formation. CWG then completed the job in Gianino Plastering's stead.
Gianino Plastering employed four people at the time of its closing: Wally, Curt, Daniel Giger, and James Gildehaus. All but Wally joined CWG's payroll immediately after Gianino Plastering went out of business, presumably while still working on the LJPP project. Curt, Giger, and Gildehaus received their last Gianino Plastering paycheck on August 10, the Friday before the judgment was entered. The next Friday, August 17, Curt and Gildehaus received a CWG paycheck. Gildehaus was aware that he had switched employers because Curt called him and said "Hey, Wally's being sued and I'm starting my own company now and Wally's no longer in the picture." Giger missed a week of pay, receiving his first CWG check on August 24, but he understood that gap to be caused by the Funds' lawsuit against Gianino Plastering. Giger testified that he did not even realize that he was working for a new company. Wally was not formally employed by CWG that year (he began receiving CWG pay in August 2013), but there is evidence that he was involved with the new company in 2012. He signed a lien waiver on behalf of CWG on November 30 and was seen at the LJPP jobsite. In short, a trier of fact could find that CWG adopted Gianino Plastering's workforce as its own after the judgment was entered.
In an attempt to downplay the continuities between the two companies, CWG emphasizes what it sees as major differences between the two entities. It stresses that CWG was solely owned and managed by Curt, while Gianino Plastering was solely owned and managed by Wally. But the Funds have offered evidence undermining this clean distinction. Wally was the sole CWG contact for at least one client; he submitted bids for at least two CWG projects; and he accompanied Curt to meetings early in CWG's existence. Furthermore, "familial control" can be treated as "common ownership and control" in appropriate labor cases. NLRB v. Dane Cnty. Dairy , 795 F.2d 1313, 1322 (7th Cir. 1986). A reasonable factfinder could find both common ownership and control between the two entities here.
The parties dispute the materiality of CWG's capitalization, common equipment, and shared clients. But the best we can say for CWG is that these disputed items are just that: disputes to be resolved at trial. CWG makes much of Curt's initial financing of CWG with $5,500 of his own money. A more significant source of initial funds, however, was the $28,800 payment that CWG accepted for Gianino Plastering's work on the LJPP project. According to its bank statements, CWG could not have met its obligations for its first month of operation using the $5,500 deposit alone. Similarly, the parties dispute whether it is significant that CWG used Gianino Plastering's trucks. Gianino Plastering sold the *905 trucks to a third party that immediately leased them to CWG. Evidence in the record of this transaction is sparse; perhaps it was a straw transaction, or perhaps it was an arms-length bargain. But there is room for a factfinder to adopt either interpretation. Last, we know that CWG and Gianino Plastering shared eight customers. But we do not know from the record how many total customers each entity serviced; it could be eight of eight, or it could be eight of one hundred. Without a denominator, this fact is not conclusive of liability; it is evidence for a factfinder to weigh.
Considered as a whole, the record would allow reasonable factfinders to differ. As to scienter , the Funds have strong evidence of intent and undisputed evidence of knowledge, but a factfinder could choose to believe Curt's account over Gildehaus's. Similarly, the Funds have submitted evidence that could suggest "substantial continuity in the operation of the business," Tasemkin , 59 F.3d at 49 (quoting G-K-G, Inc. , 39 F.3d at 748 ), and "substantially identical management, business purpose, operation, equipment, customers, supervision, and ownership," Rabine , 161 F.3d at 433. The Funds' evidence is not flawless-after all, it is the rare case that can meet that standard-but the district court was too quick to grant summary judgment in CWG's favor.
III
Because the Funds have presented sufficient evidence to proceed to trial on both theories, we REVERSE the judgment of the district court and REMAND for further proceedings consistent with this opinion.