541 F.2d 135
 93 L.R.R.M. (BNA) 2049, 79 Lab.Cas. P 11,571
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
SECURITY-COLUMBIAN BANKNOTE COMPANY, a Division of U. S.
Banknote Corporation, Respondent,
Graphic Arts International Union, Local 14L, Intervenor.
 No. 75-2273.
 United States Court of Appeals,
Third Circuit.
 Argued June 8, 1976.
Decided Aug. 19, 1976.
 
 Elliott Moore, Deputy Associate Gen. Counsel, Robert Sewell, John Depenbrock, N. L. R. B., Washington, D. C., for petitioner.
 Malcolm L. Pritzker, Philadelphia, Pa., for respondent.
 Richard H. Markowitz, Stephen C. Richman, Markowitz & Kirschner, Philadelphia, Pa., for intervenor.
 Before VAN DUSEN, GIBBONS and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 The delicate and subtle problems involved in the labor law doctrine of employer successorship are again presented in this proceeding. The National Labor Relations Board seeks enforcement of an order resulting from its determination that Security-Columbian Banknote Company (Security) is a successor employer of a company from which Security purchased printing plant assets. For the reasons stated hereinafter, we enforce the order only in part.
 
 I.
 
 2
 Like many successor stories, our saga must begin with the predecessor employer. Federated Banknote Company (Federated) engaged in engraved stock and bond printing at a plant located on Caroline Road, Philadelphia, Pennsylvania (Caroline plant). Its complement of sixty-six production employees was represented by several unions. Among these was the Philadelphia Printing Pressmen, Assistants and Offset Workers' Union No. 4 (Pressmen), which represented a unit composed of twelve letterpress and offset employees. The record does not reveal that the Pressmen were formally certified as a bargaining representative for this unit, but the union had negotiated collective bargaining agreements with Federated since 1967. The last such agreement ran from May 1, 1970 to April 30, 1973, and was extended by consent of the parties until May 18, 1973.
 
 
 3
 Security, the respondent herein, operates a plant, also in Philadelphia, at 55th and Sansom Streets (Sansom plant), approximately twenty miles from the Caroline plant, where it designs, engraves and prints stocks and bonds. It has been a member of a multi-employer association which has negotiated collective bargaining agreements with various unions. A unit of eight letterpress employees at the Sansom plant is covered by such an agreement with the Pressmen. A separate agreement with Graphic Arts International Union, Local 14L (Graphic Arts) covers a unit of twelve employees performing offset functions at the Sansom plant. Section 2 of this contract provided:
 
 
 4
 This contract shall be binding on all members of the Association for their plants or departments in the Philadelphia area. . . .
 
 
 5
 The agreement also contained a union security clause.
 
 
 6
 In the spring of 1973 respondent's parent company reached an agreement to purchase the Caroline plant from Federated. On April 18, Pressmen business agent Frederick Day informed respondent's parent that the Pressmen represented certain employees in a bargaining unit at the Caroline plant and had a collective bargaining agreement with Federated. Day demanded that Security recognize and bargain with the Pressmen for those employees as soon as Security took over the plant assets.
 
 
 7
 Later in April, Security's Sansom plant manager, Robert Christopherson, initiated a telephone conversation with Walter Buczko, secretary of Graphic Arts. Christopherson explained that Security was negotiating to purchase the Caroline plant and wanted to hire offset employees of Federated who were not members of Graphic Arts. Buczko posed no objection.
 
 
 8
 In further negotiations with the Pressmen, respondent took the position that it would recognize the Pressmen as representative of the retained letterpress operators at the Caroline plant, but the retained offset employees would become subject to Security's contract with Graphic Arts and would have to join the latter union.
 
 
 9
 On Friday, May 18, Security acquired the Caroline plant assets from Federated. The purchase agreement included rights to the land and buildings, fixed assets, machinery, equipment, inventories, copyrights, contracts, orders and work in progress. Security hired forty-five production employees, all of whom had been employed by Federated. These people were hired after interviews and consideration of their work records. They all received new seniority dates. Included in that group were eight of the twelve letterpress-offset employees who had formed the Federated unit represented by the Pressmen. Security assigned four of these individuals to offset work and four to letterpress work; the two groups were placed in separate departments. Security extended the bargaining rights of all the unions with which it had contracts at the Sansom plant to cover the employees working at Caroline Road who were working within the jurisdiction of the unions' respective collective bargaining agreements. Following this practice, respondent recognized the Pressmen as bargaining representative for employees engaged in letterpress work, and recognized Graphic Arts as bargaining representative for employees doing offset work. It also applied the collective bargaining agreement it had with Graphic Arts at the Sansom plant to the four Caroline plant offset employees.
 
 
 10
 Federated management was not hired by respondent. Security's Sansom plant manager, Christopherson, became manager for both plants, and spends approximately forty percent of his time at the Caroline plant. Security retained four of the seven Federated foremen; one was put in charge of production and given the title of "Assistant Plant Manager." Another was hired and employed only as a production worker. Three new assistant foremen were hired. Christopherson distributes printing work between the two plants, sets personnel policies for both, and except for collective bargaining handled by the multi-employer association, he is in charge of labor relations for both plants. Personnel records for employees of both plants are maintained at the Sansom plant. Some department foremen also divide their time between the two plants. A single sales force sells the product manufactured at both plants.
 
 
 11
 Respondent purchased almost all of Federated's equipment and used approximately 70% to continue operations at the Caroline plant; the other 30% was discarded. Respondent also shifted equipment from its other plants to the Caroline plant, and in at least one case transferred employees to operate a piece of equipment. Some equipment was moved from the Caroline plant to the Sansom plant and other locations. There is some interchange of common work materials between these plants.
 
 
 12
 Security also continued Federated's work in progress, completed 65% of it, and completed more than half of the new orders solicited by Federated but not previously processed. Ninety percent of the engravings done at the Sansom plant were printed at the Caroline plant. Security also closed Federated's composing room, moved some work previously done at the Caroline plant to the Sansom plant, and relocated other work to Security's Chicago plant.
 
 
 13
 Based on these facts, the General Counsel argued to the Administrative Law Judge (ALJ) and the Board that Security was a successor employer to Federated and as such was obligated to recognize and bargain with the Pressmen as representative of the retained employees of the Federated printing and offset unit. Respondent's principal defense was that acquisition of the Caroline plant was an accretion to its already existing operations in Philadelphia, that it was obligated under its contract with Graphic Arts to recognize the latter as bargaining representative for the offset employees at Caroline Road, and that the bargaining units at the Caroline plant were properly treated as accretions to units at the Sansom plant. The ALJ rejected the accretion argument and held, that by recognizing Graphic Arts and applying its collective bargaining agreement to the Caroline offset employees, respondent violated sections 8(a)(1), (2) and (3) of the National Labor Relations Act. The ALJ also rejected the General Counsel's successorship argument and held that Security did not violate sections 8(a)(5) and (1) of the Act by refusing to recognize and bargain with the Pressmen as representative of the offset employees.
 
 
 14
 The Board affirmed the ALJ's accretion findings, but found that respondent was a successor employer to Federated and was, therefore, obligated to recognize and bargain with the Pressmen. Its failure to do so was held to be violative of sections 8(a)(5) and (1). Security was ordered to cease and desist from the unfair labor practices found, to withdraw and withhold recognition from Graphic Arts as representative of the Caroline plant offset employees and to recognize and bargain with the Pressmen as the exclusive bargaining representative of those employees.
 
 II.
 
 15
 The context of this case is but one of several in which the successorship question can arise. See, e. g., John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964) (survival of an arbitration clause); Golden State Bottling Co. v. N. L. R. B., 414 U.S. 168, 94 S.Ct. 414, 38 L.Ed.2d 388 (1973) (whether a successor employer is liable under a remedial order issued by the NLRB against the predecessor in an unfair labor practice proceeding). In each of these situations, the underlying policy of the successor employer doctrine is the same: it seeks to facilitate transfers of capital to enable reorganization and vitalization of business enterprises but at the same time protect employee rights and assure the accomplishment of the transition in an environment of industrial peace. See International Ass'n of Machinists, Dist. Lodge 94 v. N. L. R. B., 134 U.S.App.D.C. 239, 414 F.2d 1135, 1139 (1969) (Leventhal, J., concurring), cert. denied, 396 U.S. 889, 90 S.Ct. 174, 24 L.Ed.2d 163 (1969); Slicker, A Reconsideration of the Doctrine of Employer Successorship A Step Toward a Rational Approach, 57 Minn.L.Rev. 1051, 1052 (1973). Cf. N. L. R. B. v. Burns Int'l Security Services, Inc., 406 U.S. 272, 287-88, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972). Changes in ownership of an enterprise may eliminate contractual obligations to employees, N. L. R. B. v. Burns Int'l Security Services, Inc., supra, but a successor employer "has frequently been required to assume the statutorily-imposed duty of the predecessor to bargain with the designated representative of its employees." Note, The Bargaining Obligations of Successor Employers, 88 Harv.L.Rev. 759, 760 (1975).
 
 
 16
 In the years over which the successorship doctrine has evolved, the Board, courts and commentators have distilled a number of factors to serve as guideposts for analysis. These factors include, inter alia, consideration of the continuity of workforce, continuity of business operations, similarity of supervisory personnel, similarity of product or service, similarity in methods of production, sales and inventorying, and use of the same plant. See, e. g., General Teamsters, Chauffeurs and Helpers, Local Union No. 249 v. Bill's Trucking, Inc., 493 F.2d 956, 963 n. 40 (3d Cir. 1974); Slicker, supra, 57 Minn.L.Rev. at 1054-63; Goldberg, The Labor Law Obligations of a Successor Employer, 63 Nw.U.L.Rev. 735, 793-806 (1969). These factors, it is often said, should be seen from the perspective of the employee. See, e. g., Teamsters v. Bill's Trucking, supra, 493 F.2d at 963 n. 40; Slicker, supra, 57 Minn.L.Rev. at 1054. This "employee viewpoint" derives from the concept that the only reason to limit a successor employer's ability to reorganize his labor relations is to offer the employees some protection from a sudden change in the employment relationship. See Golden State Bottling Co. v. N. L. R. B., supra, 414 U.S. at 181-82, 94 S.Ct. 414. Thus, the inquiry must ascertain whether the changes in the nature of the employment relationship are sufficiently substantial to vitiate the employee's original choice of bargaining representative. See, e. g., N. L. R. B. v. Armato, 199 F.2d 800, 803 (7th Cir. 1952); Note, supra, 88 Harv.L.Rev. at 765-71.
 
 
 17
 Certification of a bargaining representative is premised on the Board's determination of the appropriateness of the bargaining unit represented. National Labor Relations Act, § 9(a), 29 U.S.C. § 159(a) (1970). When a change in the control of a business enterprise destroys a pre-existing bargaining unit for valid economic and operational reasons, the employee's original choice of bargaining representative is sufficiently vitiated to require reexamination. The Supreme Court recognized this proposition in Burns when it stated:
 
 
 18
 It would be a wholly different case if the Board had determined that because Burns' operational structure and practices differed from those of Wackenhut, the Lockheed bargaining unit was no longer an appropriate one.
 
 
 19
 N. L. R. B. v. Burns Int'l Security Services, Inc., supra, 406 U.S. at 280, 92 S.Ct. at 1578. Since Burns, the Board has also given explicit recognition to this principle:
 
 
 20
 . . . all of the Board cases in which successorship was found are predicated on the finding that the predecessor's bargaining unit remained intact under the successor and continued to be an appropriate unit.
 
 
 21
 See N. L. R. B. v. Denham, 469 F.2d 239, 243 (9th Cir. 1972), vacated and remanded, 411 U.S. 945, 93 S.Ct. 1925, 36 L.Ed.2d 407 (1973); N. L. R. B. v. Interstate 65 Corp., 453 F.2d 269, 272 (6th Cir. 1971); Note, supra, 88 Harv.L.Rev. at 765-71. Thus, when, as in this case, the question is whether the purchaser of plant assets must bargain with organized employees of his predecessor, a necessary predicate for imposing the duty to bargain is retention of the employees of the predecessor and the continued appropriateness of the unit.
 
 
 22
 The ALJ and Board decisions in this case differ on the continued appropriateness of the bargaining unit. As previously noted, the Pressmen's bargaining unit under Federated consisted of twelve employees who performed both letterpress and offset work. Security hired eight of these employees and split them into two separate departments, one engaged in offset and the other in letterpress. From these facts, the ALJ concluded that "the bargaining unit in issue here did not remain intact or retain its separate identity following the takeover of the Caroline plant." Accordingly, he refused to find that respondent inherited Federated's duty to bargain with the Pressmen. In reversing the ALJ on this point, the Board reasoned:
 
 
 23
 All of the factors mentioned to substantiate the change in the unit's identity are directly attributable to the Respondent's unlawful recognition of Graphic Arts as the bargaining representative of the offset employees. But for this recognition and the subsequent changes which resulted, the department would have remained intact, retaining its original identity, with its employees functioning in the same manner as under Federated.
 
 
 24
 Thus the Board, although recognizing that the unit's identity had changed, apparently believed that the changes were made without proper business justification and were attributable solely to impermissible motives.
 
 
 25
 We must, of course, enforce the Board's decision if it is supported by substantial evidence in the whole record. The Board has not cited to us, nor has our careful examination of the record revealed, any evidence to substantiate the Board's conclusion that Security's dismantling of the bargaining unit in issue was due to a desire to recognize Graphic Arts as the bargaining representative of the offset employees. To be sure, the Board's conclusion is a possible inference from this record. However, given the other extensive changes respondent made in its operations and organization after the takeover of the Caroline plant changes apparently motivated only by justifiable business purposes it is equally plausible that Security had some organizational purpose in separating the offset and letterpress workers. In the absence of evidence supporting the Board's inference, we cannot hold this aspect of the Board's decision supported by substantial evidence.
 
 III.
 
 26
 Respondent continues to defend its recognition of Graphic Arts as bargaining representative of the offset employees at the Caroline plant and its application of the Graphic Arts' collective bargaining agreement to those employees on the ground that the offset group at Caroline road constituted an "accretion" to the existing bargaining unit of offset employees at the Sansom plant.
 
 
 27
 Simply stated, an accretion is the incorporation of employees into an already existing larger unit when such a community of interest exists among the entire group that the additional employees have no separate unit identity. Thus, they are properly governed by the larger group's choice of bargaining representative. See N. L. R. B. v. Food Employers Council, Inc., 399 F.2d 501, 502-03 (9th Cir. 1968). An accretion and a unit determination are similar concepts, but the Board has restrictively applied the accretion principle since it operates to deny the accreted employees a vote on their choice of bargaining representative. See Sheraton-Kauai Corporation v. N. L. R. B., 429 F.2d 1352, 1355-56 (9th Cir. 1970); Pix Manufacturing Co., 181 N.L.R.B. 88, 90 (1970); Melbet Jewelry Co., Inc., 180 N.L.R.B. 107, 110 (1969). The factors relevant to finding an accretion include integration of operations, centralization of managerial and administrative control and geographic proximity. Also relevant are similarity of working conditions, skills and functions, common control over labor relations, collective bargaining history and interchangeability of employees. N. L. R. B. v. Sunset House, 415 F.2d 545, 548 (9th Cir. 1969); Spartans Industries, Inc. v. N. L. R. B., 406 F.2d 1002, 1005 (5th Cir. 1969); The Great A & P Tea Co., 140 N.L.R.B. 1011, 1021 (1963). "Whether or not a particular operation constitutes an accretion or a separate unit turns . . . on the entire congeries of facts in each case." The Great A & P Tea Co., 140 N.L.R.B. at 1021. An accretion decision, like other unit determinations, is generally committed to the Board's informed discretion. N. L. R. B. v. Sunset House, supra, 415 F.2d at 548; Spartans Industries, Inc. v. N. L. R. B., supra, 406 F.2d at 1005.
 
 
 28
 In this case, the Board did not address its opinion to the accretion question, but rather affirmed the rulings of the ALJ. The latter analyzed the accretion problem as follows:
 
 
 29
 While a consideration of the evidence pertaining to those factors applicable to both plants disclosed centralized management; common control over labor relations and personnel policies; central personnel records keeping; common sales force; common purchasing; similar working conditions; possession of similar work skills and functions; and an interchange of items commonly used in the production process, such evidence failed to establish that the interchange of employees and work products and the transfer of employees between the two plants were other than minimal or that the operation of the Caroline Plant was not substantially autonomous. Upon considering these factors in their entirety and in view of the geographic separation of the two plants and prior bargaining history, I find that those employees performing "offset" functions at the Caroline Plant were not an accretion to the existing bargaining unit of offset employees at the Sansom Plant.
 
 
 30
 Substantial evidence in the record supports the ALJ's factual findings. On this record, we cannot say that the weight he attributed to these factors in reaching his conclusion that there was no accretion constitutes an abuse of discretion. The twenty-mile geographical separation alone is a strong factor. The record does not show that the interchange of employees and work products between the two plants was so substantial as to overcome the autonomy inherently created by the significant spatial separation. Security management officials spent over fifty per cent of their time at the Sansom plant. The two Sansom plant officials responsible for the offset and letterpress departments spent a total of only about five hours a week at the Caroline plant. The Caroline plant's day-to-day operations were run largely under the supervision of the former Federated foremen, particularly DiLorenzo, who acted as "Assistant Plant Manager." On this record, it was not unreasonable for the ALJ to conclude that the Caroline plant was run as a sufficiently autonomous entity to negate the community of interest necessary to an accretion finding.[1]IV.
 
 
 31
 In accordance with the foregoing, we affirm the Board's findings that Security violated sections 8(a)(1), (2) and (3) of the Act by recognizing Graphic Arts as bargaining representative of the offset employees at the Caroline plant and by applying the Graphic Arts collective bargaining agreement to those employees. We reverse the Board's finding that Security violated sections 8(a) (1) and (5) of the Act by refusing to recognize and bargain with the Pressmen. The Board's order will be enforced only insofar as consistent with our holding. The Board will submit an appropriate order. Each party will bear its own costs.
 
 
 
 [1]
 The Company argues that several comparable cases in which the Board found an accretion indicate that it acted here in an arbitrary, capricious and unreasonable manner. However, close examination of its proffered decisions shows that they all are materially distinguishable
 In Border Steel Rolling Mills, Inc., 204 N.L.R.B. 814 (1973), the successor acquired a maintenance shop that had been operated by the predecessor on the successor's own premises. Most of the predecessor's business had been in maintenance and repair work on trucks for the successor. The successor had a four hundred employee single plant unit. The twelve employees of the predecessor hired by the successor were held to be an accretion to the existing unit. The facts disclose that even before the acquisition, the two operations were practically integrated. The juxtaposition of the joint operations and size disparity made an accretion finding the only reasonable disposition.
 In Electrospace Corp., 189 N.L.R.B. 572 (1971), the employer opened a new plant, the entire workforce of which was comprised of employees from the employer's first plant. The Board rejected the effort of a union to organize the second plant, holding that the second plant was merely a relocation and expansion of the first. AMF, Cuno Division, 205 N.L.R.B. 984 (1973), was merely a unit determination. In both these cases there was no problem, as in accretion cases, of depriving employees of an opportunity to choose their bargaining representative.
 N. L. R. B. v. Baton Rouge Waterworks Company, 417 F.2d 1065 (5th Cir. 1969), involved a public utility and its wholly owned subsidiary, Parish Water Company. The Board traditionally, because of the inherent interdependence and integration of operations in utilities, "has considered the system-wide unit to be optimal for collective bargaining in public utility industries." Conn. Light & Power Company, 222 N.L.R.B. No. 188 (1975). To the extent that the holding of Baton Rouge may be inconsistent with this opinion, we reject it.