842 F.2d 331
 Unpublished Disposition
NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
Everett HADIX, Richard Mepes, Patrick C. Sommerville,
Rossevelt Hudson, Jr., Brent E. Koster, Lee A. McDonald,
Darryl Sturges, Robert Flemster, William Lovett, James
Covington, Frank Thomas, James Hadix, Plaintiffs-Appellees,
v.
Perry JOHNSON, Individually and as Director of the Michigan
Department of Corrections; Barry Mintzes,
Individually and as Warden; et al.,
Defendants- Appellants.
 No. 86-1701.
 United States Court of Appeals, Sixth Circuit.
 March 17, 1988.
 
 Before ENGEL, KRUPANSKY and DAVID A. NELSON, Circuit Judges.
 PER CURIAM.
 
 
 1
 This appeal stems from a class action filed in a federal district court in Michigan under 42 U.S.C. Sec. 1983. The action was brought on behalf of all prisoners--about 2366 in number--confined in the Central Complex of the State Prison of Southern Michigan.
 
 
 2
 A comprehensive and detailed consent decree was entered in the class action on May 13, 1985, before the particular matter now before us had arisen. One of the provisions of the consent decree seems to have contemplated that regulations relating to "Classification," "Due Process," and certain aspects of the Central Complex prisoners' right of access to the courts would be written by the district court itself after an evidentiary hearing. Pursuant to this rather unusual provision, the district court conducted a series of evidentiary hearings at various times in 1985 and 1986. At last report the court had enlisted the assistance of two law professors to assist in the regulation-writing project.
 
 
 3
 In the course of one of the 1986 hearings the testimony of a sometime Central Complex inmate named J. Spencer Thornton prompted the court to undertake--apparently on its own motion--an exploration of the question "whether or not the Consent Judgment was observed" by the prison authorities in dealing with a quantity of tangible personal property belonging to Mr. Thornton. The court threatened to exercise its contempt powers if this prisoner's property should be shown not to have been handled in conformity with the consent decree.
 
 
 4
 The evidence indicated that Mr. Thornton, who is serving a life sentence for first degree murder, had been a "jailhouse lawyer" for some ten years or more. Like many students of the law, he tended to accumulate large quantities of paper. Mr. Thornton, a college graduate, seems to be a man of wide interests, and his scholarly pursuits have not been confined to the law. Over the course of his stay in the Central Complex he amassed enough books, files, and other materials--both "legal" and "nonlegal"--to fill about 13 large footlockers. This was far in excess of what was allowed under Michigan's existing prison regulations.
 
 
 5
 On March 17, 1986--Evacuation Day, appropriately enough--Mr. Thornton was scheduled to vacate his Central Complex cell and move to quarters in the prison's North Complex, his security level having been reduced from "close confinement" to "medium confinement." The prison authorities refused to let Mr. Thornton take all his impedimenta with him when he moved, and he refused to move without taking everything along.
 
 
 6
 The prison officials eventually resolved the dilemma by putting Mr. Thornton's possessions in the prison property room and Mr. Thornton in administrative segregation. He was soon let out of segregation, and an administrative "legal property hearing" was convened a few days thereafter. Declaring "I refuse to cooperate in any way," Mr. Thornton declined to give the administrative hearing officer any assistance in determining which items of property could be retained under the applicable guidelines. By April 22, 1986, when Mr. Thornton finally made the move to the North Complex, he still had not been reunited with most of his property.
 
 
 7
 In June of 1986 Mr. Thornton appeared as a witness before the district court. He testified once on June 13 and again on June 27. (Because Mr. Thornton had not been a resident of the Central Complex since April, he was no longer a member of the plaintiff class when he testified.) Prior to his appearance on June 27, Mr. Thornton seems to have recovered most, if not all, of his "legal" materials, as opposed to those classified as "non-legal."
 
 
 8
 On July 1, 1986, the district court entered an order captioned "ORDER REQUIRING RETURN OF PROPERTY TO J. SPENCER THORNTON AND ESTABLISHING PROCEDURES FOR HEARING." The order--which was not accompanied by any findings of fact or conclusions of law--read as follows:
 
 
 9
 "IT IS ORDERED that:
 
 
 10
 1. All property belonging to J. Spencer Thornton, inmate # 142902 shall be returned to him, forthwith.
 
 
 11
 2. Prior to any property being taken from Mr. Thornton, the Defendants must conduct an administrative hearing in accordance with the Consent Judgment entered in this case.
 
 
 12
 3. Plaintiffs' counsel shall receive advance, reasonable notice of any intended hearing and shall be permitted to appear at the hearing on behalf of Mr. Thornton."
 
 
 13
 This is the order from which the defendant prison officials have appealed. They point out that the order fails to set forth the reasons for its issuance, notwithstanding that Rule 65(d) of the Federal Rules of Civil Procedure requires that "[e]very order granting an injunction ... shall set forth the reasons for its issuance." The defendants further argue that even if the district court had found that there was a violation of the consent decree, the court would have had no authority to require that Mr. Thornton be accorded the benefits of the consent decree in perpetuity, regardless of his having ceased to be a member of the class to which the decree applies.
 
 
 14
 The plaintiffs, for their part, argue that the district court's order was not a final decision, and thus cannot be appealed under 28 U.S.C. Sec. 1291. Further, they say, if this court does have jurisdiction to hear the appeal, we ought to affirm the order on the grounds (1) that there was a "flagrant" violation of Mr. Thornton's rights under the consent decree, (2) that the violation occurred at a time when Mr. Thornton was still a member of the plaintiff class, and (3) that the All Writs Act, 28 U.S.C. Sec. 1651, empowered the district court to issue the challenged order in aid of the court's jurisdiction.
 
 
 15
 We shall vacate the order. If the order is interlocutory, it is appealable under 28 U.S.C. Sec. 1292(a) as an order granting an injunction. As to the merits, while there may or may not have been a technical violation of the consent decree, the record suggests no "flagrant" misconduct on the part of the prison officials. Although the district court undertook a painstaking factual inquiry, it failed to make any findings of fact, failed to explain why any order was appropriate, and failed properly to tailor the order to the circumstances that presumably led to its issuance.
 
 
 16
 * On July 2, 1985, the director of the Michigan Department of Corrections approved a nine-page "Policy Directive" on "Prisoner Personal Property Control." The Directive, which became effective on September 16, 1985, has state-wide application; it covers all prisoners at institutions under the jurisdiction of Michigan's Bureau of Correctional Facilities. An attempt to enforce this Policy Directive in Mr. Thornton's case is what led to the "Return of Property to J. Spencer Thornton" order that is before us on appeal.
 
 
 17
 The stated objective of the Policy Directive is
 
 
 18
 "[t]o establish guidelines governing prisoner personal property, for control of such property to prevent loss or damage, and to prevent fire, safety and sanitation hazards."
 
 The Directive goes on to declare that:
 
 19
 "Excessive personal property in housing units constitutes a fire hazard, and creates sanitation, housekeeping and security problems. Each institution shall ensure that, except for those items specifically exempted in the Property Limits section of this policy, the maximum amount of personal and state issue property accumulated by each prisoner does not at any time exceed that which can be placed in one state-issued duffel bag and one footlocker, if purchased by the prisoner." (Emphasis in original.)
 
 
 20
 The "Property Limits" section of the Directive lists the types of personal property allowed prisoners in Michigan penal institutions. Paragraph B-25 of this listing reads as follows:
 
 
 21
 "Legal papers pertaining to a prisoner's personal pending litigation. If the prisoner's property exceeds allowable amounts due to excess legal material, the matter shall be referred to a Hearings Division hearings officer to determine if the material is essential to the prisoner's pending cases and is not available in the law library. The legal papers of another prisoner who has litigation pending may be kept if a written agreement for legal assistance exists in accordance with PD-DWA-61.01."
 
 
 22
 Paragraphs IV F and IV G of the Directive provide in pertinent part as follows:
 
 
 23
 "On transfers between institutions, each prisoner will be permitted his/her footlocker and a duffel bag. The duffel bag (MSI # 3238) shall be furnished by the sending institution and must be unpacked at the destination. All property which will not fit into the bag and footlocker, except for the items exempted in the Property Limits section and legal materials, will be disposed of in accordance with Section V of this policy directive.
 
 
 24
 * * *
 
 
 25
 * * *
 
 
 26
 "Prisoners may pack their own typewriter, sewing machine, TV set and musical instrument. These items must be packed in appropriate containers, furnished by the institution if necessary, to prevent damage in transit."
 
 
 27
 The consent decree entered by the district court on May 13, 1985--a decree applicable only to the Central Complex of the State Prison of Southern Michigan--takes up more than 32 single-spaced typewritten pages, exclusive of a three-page index and four appendices containing an additional 11 pages. Paragraph 13 of a section of the decree captioned "Access to Courts" reads as follows:
 
 
 28
 "Any property limitation imposed on prisoners shall not apply to legal papers and law books except that if the quantity thereof conflicts with important institutional goals such as security or fire safety, a limitation may be sought through the administrative hearing process. The standard for imposition of a limitation shall be whether the material in question is reasonably necessary to assist the prisoner with respect to his pending litigation."
 
 
 29
 At a hearing session conducted by the district court on June 24, 1986, a fire safety inspector gave testimony indicating that the quantity of papers in Mr. Thornton's Central Complex cell did indeed conflict with the important institutional goal of fire safety. The fire inspector, a Mr. Bristow, explained that Mr. Thornton's cell had been "stacked from the floor close to the ceiling and from the north wall to almost halfway across the means of egress with legal materials." Given the amount of combustibles and the way in which they were stored in the cell, Mr. Bristow testified, the condition of the cell presented fire safety problems.
 
 
 30
 The testimony of Sergeant Arthur Barber, another Department of Corrections employee assigned to the Central Complex, indicated that the quantity of legal materials in Mr. Thornton's cell was also in conflict with the important institutional goal of security:
 
 
 31
 "Q. Could you describe his cell?
 
 
 32
 A. Well, his cell had one wall from the floor to the ceiling filled with legal materials, papers and other objects that was papers, I guess, legal law books, other things like that.
 
 
 33
 Q. And did the amount of storage of Mr. Thornton's property present any security problems?
 
 
 34
 A. Yes, it's very hard to shake down a cell looking for dangerous contraband, drugs and other items, if you don't have the time to shake it down such a large quantity of personal property.
 
 
 35
 Q. How long would you estimate it would take to do a thorough shake down of Mr. Thornton's cell the way you saw it in Twelve Block?
 
 
 36
 A. Three to four hours."
 
 
 37
 On cross-examination, Sergeant Barber had this to say:
 
 
 38
 "Q. Did you ever shake Mr. Thornton's cell down?
 
 
 39
 A. Not properly, no, I didn't have the time.
 
 
 40
 Q. How long does it take to shake down a cell where there is no storage of legal materials?
 
 
 41
 A. A small quantity, probably 20 minutes, 25 minutes to do a real thorough shake down.
 
 
 42
 * * *
 
 
 43
 * * *
 
 
 44
 Q. How often do you do that?
 
 
 45
 A. Once a month."
 
 
 46
 If Sergeant Barber had been able to shake down Mr. Thornton's cell "properly," one of the items he might have found there was something that the hearing officer who did ultimately go through Mr. Thornton's property described as follows:
 
 
 47
 "One item I would have considered contraband was a flattened piece of metal that ... was about five inches long, [and] had a taped label [sic; should be "handle"]. And from experience in other hearings, [this] was an item used to unlock cell doors without using a key. Much as you might use a credit card to unlock a door."
 
 
 48
 The hearing officer, a gentleman named Arvid Perrin, was assigned to Mr. Thornton's case pursuant to a "Notice of Intent to Conduct an Administrative Hearing" prepared by a Central Complex official under date of March 17, 1986. (It will be recalled that this was the date originally designated for Mr. Thornton's move to the North Complex.) The notice, prepared on a Michigan Department of Corrections form, describes the nature of the hearing as "Excess Legal Material." Under the heading "Reason for Hearing," the notice states: "While packing this man for Northside transfer we found in his possession excess legal material." Under the heading "Proposed Disposition," the notice says: "Handle excess legal material in accordance with departmental policy."
 
 
 49
 Departmental policy, as we have seen, called for the matter to be referred to a Hearings Division hearings officer. Mr. Perrin was that officer. His qualifications for the job are not unimpressive. He testified that he holds a Bachelor of Arts degree, a Master of Arts degree from a theological seminary, and a Juris Doctor degree from Indiana University. He has been a member of the Michigan bar since 1975, and his vita includes service as an attorney for Wayne County Neighborhood Legal Services and Upper Peninsula Legal Services in Marquette. At the time of his appearance before the district court on June 24, 1986, he had been a hearing officer in the Michigan Department of Corrections for over four years.
 
 
 50
 As appears from Hearing Officer Perrin's testimony before the district court, as well as from a lengthy administrative hearing report he prepared on April 11, 1986, Mr. Perrin convened a "Legal Property Hearing" on April 2, 1986. The hearing was held in the property room to which Mr. Thornton's goods and chattels had been removed. When the prisoner arrived at the property room, Hearing Officer Perrin read him the March 17 Notice of Intent and the pertinent provisions of the Department of Corrections Directive on Prisoner Property Control. Mr. Perrin then asked Mr. Thornton to point out the particular items of property that he thought were exempt from the property limits as being relevant to pending or intended litigation.
 
 
 51
 Mr. Thornton objected to the hearing officer's actually reading any of the materials in question. The hearing officer explained that he would not be able to make a determination on the substance of the material if he could not examine it, but Mr. Thornton continued his objection. The hearing officer then asked if there were any materials on which Mr. Thornton needed to work immediately, or that he expected to need within the next 10 days or two weeks, so that Mr. Thornton could take those materials back to his cell with him pending a determination on the disposition of the rest of the property. Mr. Thornton refused to take anything, and gave the hearing officer to understand that "he wasn't going to take anything unless he took it all."
 
 
 52
 Hearing Officer Perrin adjourned the hearing and "relisted" the matter to a hearing investigator. In the words of Mr. Perrin's report, the hearing investigator was requested "to call the resident out to ask the resident if he needs any assistance." In addition, the hearing investigator was requested to make the following inquiries:
 
 
 53
 "1. Ask the resident if he has any witnesses or documents he wishes the [hearing investigator] to obtain?
 
 
 54
 2. Ask the resident if he has an itemized list of his legal material?
 
 
 55
 3. Ask the resident if he has any statement of how each item of legal material is pertaining to and essential to his personal pending litigation or future intended litigation.
 
 
 56
 4. Ask the resident the names/numbers of prisoners with whom he has written agreements for legal assistance if any.
 
 
 57
 5. Ask the resident which items of legal material, if any, are related to work he is doing for others and a statement of how each item is related to the legal assistance he is rendering?"
 
 
 58
 On the morning of April 7, 1986, a hearing investigator called Resident Thorton out of his cell pursuant to Hearing Officer Perrin's instructions. Mr. Thornton declined to respond to her questions. She tried again on the morning of April 8, 1986, and again, as she noted in her report, Mr. Thornton "did not want to answer questions." Mr. Thornton instead gave her a written statement, dated April 8, 1986, in which he said, among other things,
 
 
 59
 "This proceeding, in its entirety, is illegal ... I refuse to cooperate in any way with an illegal procedure which violates MDC Policy, the federal court order, U.S. Constitutional guarantees, and Michigan Constitutional guarantees. As an officer of the court, Mr. Perrin, 175470, either knows or should know that he is acting illegally."
 
 
 60
 Mr. Perrin, for his part, communicated with his superiors in Lansing and sought instructions on how to proceed. On or about April 9, 1986, he spoke on the telephone with a Ms. VanOcten, in Lansing, who read him the language of paragraph 13 of the "Access to Courts" section of the consent decree. He also spoke with a Mr. DeHain, who reenforced standing instructions to the effect that the Policy Directive was to be interpreted and applied "leniently."
 
 
 61
 Hearing Officer Perrin reconvened the administrative hearing on the morning of April 10, 1986. Again he asked Mr. Thornton to identify those items of property that were claimed to be exempt from the property limits. In response, as Mr. Perrin testified, Mr. Thornton "motioned to all the property and said that it was all legal property ... I asked him again if he wanted certain of it right now, that he could take that, and he said he wanted all of it or none of it."
 
 
 62
 Mr. Thornton was then excused from the hearing. Pursuant to instructions he had received from Lansing, Hearing Officer Perrin proceeded to unseal the boxes "and go through each item, each paper, book, file." The task took until 11 o'clock that night.
 
 
 63
 Mr. Perrin found that materials of a non-legal nature were mixed into the legal files. When asked to give an example of "non-legal" materials, he referred to "personal correspondence, scientific sociological information that he accumulated, paper, newspaper clipping[s], a large amount of scientific, electrical engineering manuals, things of this nature."
 
 
 64
 Asked if he found any contraband in Mr. Thornton's property, Mr. Perrin described the flattened piece of metal that could be used to unlock cell doors. (The hearing report, a copy of which was received in evidence by the district court, refers to this article as follows: "Also found in one file was a flat strip of metal about 5 inches long and one inch wide with a taped handle commonly known as a prison made door key to open a cell door.")
 
 
 65
 When asked if he found anything that had the appearance of legal materials but proved not to be, Mr. Perrin replied that in addition to "literature [that] would be stuck in between legal material, I found two books that had the Jackson SSP ... library stamp on them which were aviation manuals." These aviation manuals from the prison library had been wrapped in brown paper and labeled "Trial Advocacy" and "Habeas Corpus."
 
 
 66
 Such of Mr. Thornton's property as Hearing Officer Perrin was able to identify as bona fide legal papers excludable from the property limits were placed in two footlockers and four smaller cardboard boxes. These containers were sealed and marked as exempt legal material. The remaining material was separated into three categories, the first of which consisted of items "found clearly not to be legal material and not exempt." Included in this category were the prison-made cell door key and numerous scientific journals and publications, plus the following:
 
 
 67
 "clothing, stationary [sic] and writing material, pens and pencils, photographs, mirrors, toiletry articles, non-legal literature, publications and books on health and nutrition, publications and books on the Jewish faith, dictionary and theusauris [sic], electronic repair manuals, food service evaluation sheets, memos from unit managers to prisoners, National Geographics, music books, empty envelopes, file folders, notebooks, radio, earphones, drawing paper, college catalogs, empty three-ring binders, blank typing paper and note pads, mechanical drawings, food stuffs, computer manuals and information, electrical testing equipment, tape recorder, sewing sundries, soap, personal letters, drafting equipment."
 
 
 68
 The second category of non-exempt items consisted of legal materials that were simply duplicates of items required to be kept in the prison law library. The third category--material "found not to relate [to] legal matters and/or pending litigation"--contained, in addition to the aviation books labeled "Trial Advocacy" and "Habeas Corpus," the following:
 
 
 69
 "file on operation of prisoner radio station, Attorney General report on New Mexico 1980 prison riot, newspaper articles on corrections department, Westside deli franchise prospectus and information, warden's forum material, files on prisoner J.C.s organization, legal work to be sent to Justin Mariani (paroled), mental health code, Collins v. People, U.S. Supreme Court Petition for Cert 1976 term, franchising information, 1934 Yale Law Review, legislative study of DOC, materials on solicitation of grants, FJC report on class action attorney fees, prison newspapers, electronic catalogs, course books, information on clocks, population statistics, cartoons, various inquiries for purchase of items, price list order forms, horn book on Property Law, material on AIDS, bills, purchase receipts[.] [A]lso not found exempt as essential to pending litigation was considerable material dealing with Viet Nam Veterans."
 
 
 70
 Mr. Thornton testified before the district court initially on June 13, 1986. He said at that time that "very little" of his property had been given back to him, although on May 23, after his move to the North Complex, he had been given access to his files "on a very limited basis."
 
 
 71
 Mr. Thornton testified again on June 27, 1986, and by that time he had evidently recovered--or had finally been prevailed upon to accept--at least four boxes of legal materials. Mr. Thornton conceded, on cross-examination, that at the time of his transfer from Central Complex to North Complex on April 22 he had taken five or six packages and "an eighth of a duffel bag." Mr. Thornton's testimony also indicated that there had been a hearing before a certain Judge Giddings (apparently a state court judge), and that Judge Giddings, unlike Hearing Officer Perrin, had been able to enlist a measure of cooperation from the prisoner. After the hearing before Judge Giddings, Mr. Thornton selected about two footlockers full of legal work and took it back to his cell. (On April 10, 1986, according to the report prepared by Hearing Officer Perrin on April 11, "[t]he resident informed the hearing officer that he had filed suit against the hearing officer and that the hearing officer was a named defendant." This suit may have been what led to the hearing before Judge Giddings.) Although the federal district judge made no findings of fact, it does not appear that there is any basis on which the district judge could have found, at the time of the issuance of the order on July 1, that any significant quantity of legal materials was still being withheld from Mr. Thornton.II
 
 
 72
 Citing 28 U.S.C. Sec. 1291, Gillespie v. Schram, 108 F.2d 39 (6th Cir.1939), and Balboa Shipping Co. v. Standard Fruit and S.S. Co., 181 F.2d 109 (2nd Cir.1950), the plaintiffs argue that "defendants have no appeal as of right to this court as the order at issue in this case is not a final decision." The order does not need to be a final decision, however, to be appealable under 28 U.S.C. Sec. 1292(a)(1). Subject to exceptions not relevant here, that statute gives the courts of appeals jurisdiction of appeals from interlocutory orders "granting ... injunctions," among other things. If the order at issue in this case is not a final decision, it is appealable because it grants an injunction. The order may well be a final decision too, but there is no need for us to address that question here. See Carson v. American Brands, Inc., 450 U.S. 79, 82-83 (1981).
 
 III
 
 73
 Turning to the merits, the defendant prison officials argue that the July 1 order was issued without authority because Mr. Thornton had not been a member of the plaintiff class since the preceding April. The plaintiffs' rejoinder--that the All Writs Act authorized the court to correct a flagrant violation of the consent decree occurring while Mr. Thornton was still a member of the class--is not persuasive.
 
 
 74
 If the district court thought the consent decree had been violated, and if the court thought the All Writs Act justified entry of the July 1 order as an appropriate means of redressing the violation, the court was required, under Rule 65(d), Fed.R.Civ.P., to explain its reasons for thinking so. The substantive power granted by the statute does not abrogate the procedural requirements imposed by the Federal Rules of Civil Procedure:
 
 
 75
 "The latter incorporate the common sense rule that a court should let the parties and an appellate court know why it acts, and on what factual basis. United States v. Merz, 376 U.S. 192, 84 S.Ct. 639, 11 L.Ed.2d 629 (1964); United States v. Forness, 125 F.2d 928, 942 (2d Cir.1942). Whether proceeding under the All Writs Act or not, a district court has no license to ignore that requirement. Cf. Golden State Bottling Co. v. NLRB 414 U.S. 168, 177 n. 4, 94 S.Ct. 414, 422 n. 4, 38 L.Ed. 388 (1973)."
 
 
 76
 Ben David v. Travisono, 495 F.2d 562, 563-4 (1st Cir.1974).
 
 
 77
 In a colloquy with the defendants' counsel concerning the failure of Hearing Officer Perrin to make any specific finding as to whether Mr. Thornton's property constituted a fire hazard, the district judge appears to have recognized the value of the common sense rule referred to in Ben David. ("When any decision is made a person making the decision ought to give reasons for the decision.") The comments made by the trial judge suggest that he thought Hearing Officer Perrin's decision was infirm because of Mr. Perrin's failure to give adequate reasons for it:
 
 
 78
 "THE COURT: ... All I am asking is, did this hearing officer give as a reason for his decision as a reason that what he was doing was withholding these materials from Mr. Thornton because of a fire hazard, yes or no. Is that in the decision?
 
 
 79
 MS. FISCHHOFF: There is no statement to that effect in the decision. The reasons for the disposition--
 
 
 80
 THE COURT: If there is no such reference in the decision, it's reasonable for me to conclude that this was not a basis for his decision, a fire hazard. And I so conclude. If he doesn't say that that is the reason, then I think it's proper for me to conclude that that was not the reason. Now if the fire hazard was not the reason for his having taken Mr. Thornton's property, then what are you asking me to do now in listening to Mr. Bristow. Are you now trying to show that even though that the hearing officer didn't find a fire hazard as a reason, that there was, none the less, a fire hazard which I should now find. Is that the purpose of your inquiry?
 
 
 81
 MS. FISCHHOFF: Yes, your Honor. Because the hearing officer acted on the basis of the policy directive. The policy directive--
 
 
 82
 THE COURT: I have already said I am not accepting that. Are you now asking me to find, even though he didn't find so, even though the administrative hearing officer did not find so, that I should find that it is, none the less, a fire hazard?
 
 
 83
 [MS. FISCHHOFF]: Yes, your Honor.
 
 
 84
 THE COURT: That, I decline to do. I don't think it's appropriate for me to do that. I am only interested in knowing why they took Mr. Thornton's property at the time. And if they didn't take it because there was a fire hazard, they took it because, as I think the administrative hearing officer said, it was not immediately necessary for the appeal. Then I am bound by that. * * * "
 
 
 85
 The district court failed to recognize that the consent decree does not, by its terms, require an administrative hearing to determine if the quantity of legal papers and law books in a particular prisoner's cell conflicts with institutional goals such as security or fire safety. What the decree says, rather, is that "if the quantity [of legal materials] conflicts with important institutional goals such as security or fire safety, a limitation may be sought through the administrative hearing process ... [in which the standard] shall be whether the material in question is reasonably necessary to assist the prisoner with respect to his pending litigation." (Emphasis supplied.)
 
 
 86
 The only standard to be applied by the hearing officer, under the consent decree, was whether the excess legal materials in Mr. Thornton's cell were "reasonably necessary to assist the prisoner with respect to his pending litigation." There was no reason for Hearing Officer Perrin to make a finding as to whether the excess legal materials conflicted with important institutional goals such as security or fire safety, because that finding had already been made for him. The blanket determination approved by the Director of the Michigan Department of Corrections when Policy Directive BCF 53.01 was issued in 1985 clearly established the existence of a conflict. Mr. Perrin had no authority to determine otherwise. Mr. Perrin's responsibility, rather, was to determine, notwithstanding the conflict, how much of the excess legal material that Mr. Thornton wanted to keep in his cell was reasonably necessary to assist Mr. Thornton in his pending litigation.
 
 
 87
 Everything we have seen indicates that Hearing Officer Perrin did a highly professional and conscientious job in making that determination. He did so notwithstanding the repeated refusals of Mr. Thornton--Achilles sulking in his tent, as it were--to help either the hearing officer or the hearing investigator figure out which items Mr. Thornton actually needed and was entitled to keep. Hearing Officer Perrin's five-page report on the legal property hearing is a model of clarity and reason, and Mr. Perrin obviously honored the instructions he received from his superiors to apply the guidelines "leniently." Whereas the consent decree contemplated that Mr. Thornton would be able to keep excess legal materials necessary to assist him in his own litigation, the hearing officer was prepared to let him keep excess legal materials relating to other prisoners' litigation as well, even though there was no record of Mr. Thornton's having entered into written agreements to provide legal assistance to others. Whereas the consent decree contemplated that Mr. Thornton could keep excess legal materials relating to his "pending" litigation, moreover, the hearing officer made it clear to Mr. Thornton that he could also keep materials relating to litigation that was merely in prospect. If the hearing officer made any mistakes in classifying the contents of Mr. Thornton's rather extensive library--and we are aware of no such mistakes--they must be charged to Mr. Thornton's unwillingness to cooperate in the classification process.
 
 
 88
 Human nature being what it is, we have no doubt that prison officials in the State of Michigan will sometimes abuse their authority. Normally the courts of the State of Michigan can be counted on to grant appropriate relief when any such abuse is brought to their attention--witness the prompt and effective intercession of Judge Giddings in the present matter--but even the courts of Michigan may occasionally nod. Federal courts have an important role to play, obviously, when state courts and state prison officials fall down on the job, as they will undoubtedly do from time to time. As far as we have been able to ascertain, however, the record of the highly unusual proceeding before us here contains no evidence of any abuse of authority by Hearing Officer Perrin or any lapse of any kind by Judge Giddings.
 
 
 89
 Speaking through Mr. Justice Stewart, the Supreme Court of the United States declared not too long ago that "[i]t is difficult to imagine an activity in which a State has a stronger interest, or one that is more intricately bound up with state laws, regulations, and procedures than the administration of its prisons." Preiser v. Rodriguez, 411 U.S. 475, 491-92 (1973). "The federal courts," as the Supreme Court reminded us in Meachum v. Fano, 427 U.S. 215, 229 (1976), "do not sit to supervise state prisons, the administration of which is of acute interest to the States." Preiser and Meachum counsel restraint on the part of the federal judiciary not only out of respect for our federalism, but also out of concern that excessive intervention by the federal courts in administrative matters for which the states are responsible may lead to excessive dependency on the part of the states.
 
 
 90
 The district court did, of course, have authority to enforce its consent decree. It is not at all clear to us, however, that any violation of the consent decree occurred. What is clear is that even if there were some reason to suppose that a violation of the consent decree had occurred, the district court's July 1 order was overbroad. The first paragraph of the order requires the return, "forthwith," of "[a]ll property belonging to J. Spencer Thornton...." "All" is a pretty comprehensive term. It is obviously not limited to legal materials--and the first paragraph would have no application to any legal materials, in this situation, if the entirety of Mr. Thornton's legal materials had already been returned to him before the order was entered. "All property" obviously does embrace, however, the five-inch metal jail key found in Mr. Thornton's legal files.*
 
 
 91
 The second paragraph of the July 1 order says that before "any" property is taken from Mr. Thornton in the future, the prison authorities must conduct an administrative hearing in accordance with a consent decree that had not been applicable to Mr. Thornton since the preceding April. "Any," again, is a very broad term; it is not limited to legal materials, and it does not exclude drugs, weapons, jail cell keys, or any other contraband. In the absence of some word of explanation by the district court as to the reasons for such a provision, we have difficulty understanding how it can be justified as a necessary or appropriate "aid" to the court's jurisdiction.
 
 
 92
 The final paragraph of the July 1 order says that reasonable advance notice of any intended hearing shall be given to counsel for the class of which Mr. Thornton ceased to be a member in April of 1986, with such counsel being "permitted to appear at the hearing on behalf of Mr. Thornton." Again, the justification for such a provision escapes us.
 
 
 93
 The order appealed from is REVERSED, and the case is REMANDED for further proceedings not inconsistent with this opinion, should such proceedings be deemed necessary for some reason.
 
 
 
 *
 Although it is certainly conceivable that a hostile prison guard planted the contraband in Mr. Thornton's files, we are aware of no such claim having been made. Hearing Examiner Perrin referred to the key in his written report, a copy of which went to Mr. Thornton in April of 1986, and Mr. Perrin testified about the key in his direct examination at the hearing on June 24; yet when Mr. Thornton took the stand on June 27, plaintiffs' counsel did not choose to ask him a single question about the jail key. Neither did plaintiffs' counsel cross-examine Hearing Officer Perrin or any other defense witness on that subject. It seems a pretty safe bet that the jail cell key was in fact the property of Mr. Thornton