940 F.2d 1538
 Unpublished Disposition
NOTICE: Tenth Circuit Rule 36.3 states that unpublished opinions and orders and judgments have no precedential value and shall not be cited except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel.
Fred P. LEIDING, Plaintiff/Appellant,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, the Kempton Company,
as Plan Administrator, Oklahoma Bankers Association
Insurance Trust, and as Trustees, Robert Hollis, George
Hauger, Harry Leonard, John Lowry, Ralph McCalmont, F.A.A.
Sewell, III, Defendants/Appellees.
Fred P. LEIDING, Plaintiff/Cross Appellee,
v.
FEDERAL DEPOSIT INSURANCE CORPORATION, the Kempton Company,
as Plan Administrator, Oklahoma Bankers Association
Insurance Trust, and as Trustees, Robert Hollis, George
Hauger, Harry Leonard, John Lowry, Ralph McCalmont, F.A.A.
Sewell, III, Defendants/Cross Appellants.
 Nos. 90-5078, 90-5154 and 90-5180.
 United States Court of Appeals, Tenth Circuit.
 Aug. 12, 1991.
 
 Before EBEL and McWILLIAMS, Circuit Judges, and NOTTINGHAM,* District Judge.
 ORDER AND JUDGMENT**
 EBEL, Circuit Judge.
 
 
 1
 This appeal involves a dispute over employee medical coverage. Appellant Fred P. Leiding argues that the district court for the Northern District of Oklahoma erred in granting summary judgment to defendants. We disagree and accordingly affirm the lower court's rulings in all particulars.
 
 FACTS
 
 2
 Fred P. Leiding served as the Chief Executive Officer of the Bixby Town and Country Bank ("Bixby") until it was placed in receivership on September 15, 1988. While employed at Bixby, Leiding received health plan coverage through Bixby's participation in the Oklahoma Bankers Association Insurance Trust ("OBA"). The OBA, like similar trusts, developed a group medical and dental insurance plan which it made available to eligible Oklahoma banks to adopt as their individual employee welfare benefit plan. The plan was administered by the Kempton Company ("Kempton") and was regulated under the Employment Retirement Income Security Act ("ERISA"). On April 7, 1986, an ERISA continuation coverage obligation was signed into law. This new provision--known as COBRA--provides that an employee whose employment terminates, other than for gross misconduct, is entitled to continued coverage under his employer's ERISA plan for 18 months after his employment terminates or until the "date on which the employer ceases to provide any group health plan to any employee." 29 U.S.C. Sec. 1162(2)(B). In July of 1986, Kempton notified all individuals covered by the Plan--including Leiding--of these new continuation rights.
 
 
 3
 On September 15, 1988, the Oklahoma State Banking Commissioner, pursuant to state law, found Bixby to be insolvent and appointed the Federal Deposit Insurance Corporation ("FDIC") as Receiver/Liquidating Agent. Bixby went into receivership at that time and officially ceased operations. Bixby additionally ceased to be a member of the OBA and ceased to pay premiums to maintain its plan as required by the contract with the OBA. Leiding's employment--like that of all Bixby employees--terminated at this time.
 
 
 4
 Rather than institute a liquidation of Bixby's assets, the FDIC entered into a purchase and assumption transaction ("P & A") with Brookside State Bank ("Brookside"), which allowed Brookside to purchase certain assets of the insolvent Bixby and to assume depositor liability from the FDIC. The P & A provided that:
 
 
 5
 [Brookside] shall have no obligation nor responsibilities under defunct bank's employee benefit plans including pension or profit sharing plans, if any, unless liquidating agent and assuming bank subsequently agree otherwise.
 
 
 6
 Brookside, which is a separate banking entity of long standing, hired a number of former Bixby employees and began to operate a branch, under the name of Brookside, at the old Bixby locaton. Leiding, however, was not taken on by Brookside. As a result, Leiding's medical coverage terminated on September 15, 1988--the date on which Bixby ceased to exist.
 
 
 7
 Both before and after termination, Leiding suffered from various heart ailments, and he unsuccessfully sought continuation coverage under the OBA plan for the 18 months following his termination. He eventually brought suit against the OBA, Kempton, the FDIC, and Brookside, arguing that he was wrongfully denied continuation coverage under the provisions of the OBA plan and under the ERISA statutes, 29 U.S.C. Sec. 1161(a) and 26 U.S.C. Sec. 4908B(f)(3). The district court for the Northern District of Oklahoma rejected Leiding's claims and granted summary judgment for the defendants in three separate orders.[1] Leiding appeals those rulings and raises two principal theories to support his claim to continued medical coverage. First, he argues that he relied on the oral assurances of plan administrators that he would continue to receive coverage in the event of Bixby's demise and that he accordingly is entitled to coverage on equitable grounds. Second, he contends that the ERISA statutes contemplated and authorized the extension of continuation coverage to employees like Leiding. He additionally appeals from the district court's rulings on attorney's fees. We affirm the district court in all respects.[2]
 
 EQUITABLE ESTOPPEL
 
 8
 Leiding contends that he "continually asked the plan administrator's representatives whether the OBA Trust provided COBRA coverage to the former employees of a member bank that fails and is taken over." Appellant's Br. at 5. According to Leiding, he "was told on many occasions by the plan administrator's representatives that yes his COBRA coverage will be available." Id. Leiding claims that he relied on these statements to his detriment and that he accordingly should be entitled to 18 months of continued coverage. This is an argument commonly known as "equitable estoppel."
 
 
 9
 Although we are certainly sympathetic to Leiding's claim, this court has clearly stated that equitable estoppel cannot be used to hold plan fiduciaries to oral promises or modifications not incorporated into the written terms of the ERISA plan. Straub v. Western Union Telegraph Co., 851 F.2d 1262 (10th Cir.1988). There we held that under ERISA "all employee benefit plans must be established and maintained pursuant to a written instrument.... This requirement that ERISA plans be maintained in writing precludes oral modifications of the Plans; the common law doctrine of estoppel cannot be used to alter this result." Id. at 1265 (quotations and citations omitted). As we noted in Straub:
 
 
 10
 A central policy goal of ERISA is to protect the interests of employees and their beneficiaries in employee benefit plans. This goal would be undermined if we permitted oral modifications of ERISA plans because employees would be unable to rely on these plans if their expected retirement benefits could be radically affected by funds dispersed to other employees pursuant to oral agreements. This problem would be exacerbated by the fact that these oral agreements often would be made many years before any attempt to enforce them.
 
 
 11
 851 F.2d at 1265 (quoting Nachwalter v. Christie, 805 F.2d 956, 960 (11th Cir.1986)). Obviously, such a strict adherence to the language of the written plan is imperative to maintaining a low-cost and dependable insurance system.
 
 
 12
 Leiding attempts to distinguish Straub by arguing that equitable estoppel may be applied to an ERISA fiduciary's interpretation of an otherwise ambiguous or undefined provision of the plan. Leiding relies primarily on two cases for this proposition. Kane v. Aetna Life Ins. Co., 893 F.2d 1283, 1286 (11th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 232 (1990) and Anderson v. Pittsburgh-Des Moines Corp., 893 F.2d 638, (3rd Cir.1990). Without adopting or addressing the logic or holding of these cases, we simply note that these cases turn on the ambiguous nature of the relevant contract provision. We find no such ambiguity in the plan provisions at issue here.
 
 
 13
 Leiding attempts to create an ambiguity by arguing that the term "employer"--used in both the contractual and statutory language--may be interpreted to include successor employers such as Brookside. We find no such ambiguity in the contract and note that the OBA summary plan[3] description makes no provision for successor employers or for the transfer of employer obligations in the event of a participant's demise. In fact, the plan explicitly states that "the employer has retained the right under the plan document to terminate the plan at any time" and that continuation coverage terminates on the date the employer terminates the plan. There is absolutely nothing in the Summary Plan Description to suggest that the obligations thereunder would outlive the existence of Bixby or any other participant who had, for whatever reason, opted to terminate the plan. Since it is beyond dispute that Bixby ceased operation on September 15, 1988--and at that time terminated its participation in the OBA plan--we fail to see any contractual language which might revive or salvage the terminated coverage. In addition, we note that Brookside is a wholly separate legal entity which at no time bargained to assume OBA coverage for all unretained Bixby employees; in fact, Brookside explicitly excluded such obligations in its P & A agreement. Brookside merely acquired certain assets of Bixby from the FDIC after Bixby had shut down and terminated the plan, and Brookside did not acquire or continue the former Bixby legal entity.[4] Based on these findings, we think it is clear that the insurance contract provides no toehold for Leiding's equitable estoppel arguments.
 
 ERISA STATUTORY PROVISION[5]
 
 14
 Undeterred by the lack of support in the contract, Leiding next argues that the statutory ERISA provisions trump the specific contract provisions and support a broader definition of "employer"--one which could be read to include a "successor employer" such as Brookside. Leiding "invites the [Tenth Circuit] to review the statute, the IRS proposed COBRA regulations, the legislative history, the application of other federal labor and tax statutes in analogous situations ..." to conclude that ERISA and COBRA contemplated an expansive definition of "employer." Appellant's Br. at 15. We decline Leiding's invitation on the grounds that even if COBRA does extend coverage obligations to successor employers, the undisputed facts of this case make it clear as a matter of law that neither Brookside nor any of the named defendants here could be considered a successor employer.
 
 
 15
 As noted above, the COBRA statute confers continuation coverage on employees who lose coverage under a plan as a result of a qualifying event. Such coverage "must extend for at least the period beginning on the date of the qualifying event and ending not earlier than the earliest of the following: .... the date which is 18 months after the date of the qualifying event.... [or] [t]he date on which the employer ceases to provide any group health plan to any employee." 29 U.S.C. Sec. 1162(2)(A)-(B). All parties agree that the qualifying event--the termination of Leiding's employment with Bixby--occurred September 15, 1988. The dispute surrounds whether and when the "employer cease[d] to provide any group health plan for any employee." According to Leiding, the employer here never ceased to provide group health coverage since the employer, Bixby, was merely reconstituted as a successor corporation, Brookside. Leiding relies on a number of NLRB cases for the proposition that Brookside is indeed a successor employer. See Appellant's Br. at 19 (citing Fall River Dyeing & Finishing Corp. v. NLRB, 482 U.S. 27, 43 (1986); NLRB v. Burns, 406 U.S. 272, 278-79 (1972)).[6] We disagree with his assessment of the undisputed facts and conclude that Brookside, upon these facts and for purposes of deciding the issue on this appeal, is not a successor employer to Bixby.
 
 
 16
 According to the Supreme Court's opinion in Fall River, the determination of whether a new company is a successor to the old focuses on whether the new company has "acquired substantial assets of its predecessor and continued, without interruption or substantial change, the predecessor's business operations." 482 U.S. at 43 (quoting Golden State Bottling Co. v. NLRB, 414 U.S. 168, 184 (1973)) (emphasis added). We think it obvious that the bank in question here underwent serious interruption and substantial change. Unlike the employers in the NLRB cases cited by Leiding, the bank here was declared insolvent and involuntarily liquidated by the Oklahoma State Banking Commissioner under the authority of the state banking law. Okla.Stat.Ann. tit. 6, Sec. 1202. As provided under that statute, the Commissioner took possession of the bank and was "vested with the full and exclusive power of management and control, including the power to continue or to discontinue the business, to stop or to limit the payment of its obligations, ... and to reorganize or liquidate the bank in accordance with the Code." Id. The Commissioner thereupon named the FDIC as Receiver/Liquidator, cedeing to the FDIC "possession of all the assets, business and property of such bank of every kind and nature whatsoever...." Id. at Sec. 1205(c). Upon acceptance of this charge, the FDIC assumed "all the powers and privileges provided by the laws of this state with respect to the liquidation of a bank...." Id. at Sec. 1205(d).
 
 
 17
 Rather than liquidate Bixby's assets in piecemeal fashion as it had the authority to do, the FDIC reached an agreement with Brookside whereby Brookside assumed certain Bixby assets and liabilities. Brookside expressly declined to assume any obligations under Bixby's employee benefit plans. Rather, Brookside continued to operate its own benefit program for its employees. Brookside ceased providing a group health plan of its own when it was terminated on September 15, 1988. We agree with the district court that "Leiding's employer ceased doing business on September 15, 1988, when the Oklahoma State Banking Commissioner declared the bank to be insolvent and appointed the FDIC as Receiver and Liquidating Agent.... [O]n that date the employer 'ceased to provide any group health plan to any employee.' " Order Sustaining Motion for Summary Judgment, Nov. 22, 1989 (quoting 29 U.S.C. Sec. 1162(2)(B)). Since, on the facts of this case, neither the Commissioner, the FDIC, nor Brookside can be considered to have been a successor employer, we affirm the district court's granting of summary judgment.
 
 ATTORNEYS' FEES AND SANCTIONS
 
 18
 Both Leiding and appellees appeal from the district court's July 13, 1990 order denying their motions for attorneys' fees, costs, and sanctions. We affirm for the reasons given by the district court.
 
 
 19
 According to ERISA Sec. 502(g)(1): "in any action under this title ... by a participant, beneficiary, or fiduciary, the court in its discretion may allow a reasonable attorney's fee and costs of action to either party." However, an award of attorney's fees under ERISA Sec. 502(g) is discretionary in nature and need not be granted as a matter of course. To find that the district court abused its discretion, we have held that "we must have a definite conviction that the court, upon weighing relevant factors, clearly erred in its judgment." Gordon v. United States Steel Corp., 724 F.2d 106, 108 (10th Cir.1983). We are satisfied that the district court here properly applied the five-prong test enunciated in Eaves v. Penn, 587 F.2d 453, 465 (10th Cir.1978), and reiterated in Gordon. Since Leiding did not prevail on any issue in this litigation, we have no difficulty affirming the district court's denial of plaintiff's motion for fees and costs. Moreover, we do not believe that the district court abused its discretion in concluding that its denial of Leiding's motion for attorney fees and costs would have no significant effect on plaintiffs' "ready access to the Federal Courts." Leiding's motion for attorney fees and costs were appropriately denied.
 
 
 20
 Appellees Kempton, OBA, and the various trustees cross-appeal the district court's denial of their motion for Rule 11 sanctions against Leiding. They contend that Leiding's claims for state law causes of action, jury trial, and extracontractual and punitive damages were factually and legally baseless. We find no abuse of discretion in the district court's order. Although the district court noted in its order that "Plaintiff's conduct in this case leaves much to be desired," it nevertheless concluded that "Plaintiff's counsel's conduct [did not] rise[ ] to the level of Rule 11 sanctions...." Order, July 13, 1990. We cannot say that this was an abuse of discretion. We accordingly affirm the district court's denial of Rule 11 sanctions.
 
 CONCLUSION
 
 21
 For the reasons stated above, we AFFIRM the district court in all particulars.
 
 
 
 *
 Honorable Edward W. Nottingham, District Judge for the District of Colorado, sitting by designation
 
 
 **
 This order and judgment has no precedential value and shall not be cited, or used by any court within the Tenth Circuit, except for purposes of establishing the doctrines of the law of the case, res judicata, or collateral estoppel. 10th Cir.R. 36.3
 
 
 [1]
 The district court dismissed Brookside as a defendant under a 12(b)6 motion. Leiding does not appeal that dismissal
 
 
 [2]
 Leiding raises a number of additional issues on appeal, including: whether it was error for the district court to grant summary judgment on the claim that the OBA failed to disclose a material restriction or disqualification feature of the plan; whether it was an abuse of discretion for the district court to deny Leiding leave to amend his complaint to include a claim under ERISA Sec. 503 against the OBA; whether it was an abuse of discretion for the district court to deny Leiding's Rule 59(e) motion regarding new evidence of employment with Brookside; whether the district court erred in denying Leiding's claim for legal remedies, including civil penalties and other extra-contractual damages, against the OBA. We affirm each of these rulings for the reasons stated in the district court's orders. We also deny defendants-appellees' motion to strike Leiding's citation of supplemental authority
 
 
 [3]
 The record does not include a copy of the actual insurance plan entered into between Bixby and the OBA. Rather, the record includes only a "Summary Plan Description." As that document expressly states: "This is a summary plan description ONLY. The plan itself is the document on which benefits are based and is available for your review upon request." However, because the Summary Plan Description is the only document before us, we must rely on it
 
 
 [4]
 Leiding makes a strained attempt to argue alternatively that he was in fact an employee of Brookside for about three hours on the evening of September 15, 1988. We reject that argument and find nothing in the record to support that contention. We think it is quite clear from the record that Leiding was terminated by Bixby on September 15, 1988 and that he was not employed by Brookside
 
 
 [5]
 Leiding's final argument for contractual ambiguity turns on a clause in the summary plan which specifies that "[t]he rules governing continuation of coverage are subject to change by governmental regulatory authority." Leiding asserts that the contractual language of the plan has been trumped and an ambiguity created by the contractual referecne to the overriding authority of the statutory provisions of ERISA and COBRA. While we acknowledge that statutory ERISA and COBRA provisions will be controlling over the specific terms of the contract, we note that this is not an argument for contractual interpretation. Rather, it is an argument for a legislatively mandated policy. If Leiding is correct in asserting that Congress intended continuation coverage to extend to employees like himself, then the contract terms are all but irrelevant and we must determine whether Brookside or any other entities were indeed "successor employers." This argument is therefore properly considered in this section, not the "Equitable Estoppel" section
 
 
 [6]
 The criteria for determining whether an employer is a successor employer in the NLRB context may not be wholly applicable to the ERISA context. The National Labor Relations Act and ERISA are designed to serve different policy goals. Further, in Fall River, 482 U.S. at 40, the Supreme Court held only that the successor corporation had a duty to bargain with the union that represented the employees of the predecessor company. The Supreme Court acknowledged that the successor employer was not bound by the terms of the labor contract between the predecessor company and the union